STATE of Minnesota, Respondent,

v.

**Kenneth ROBINSON, Appellant.**

No. C1–87–1553.

Supreme Court of Minnesota.

July 15, 1988.

Susan J. Andrews, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Alan L. Mitchell, St. Louis Co. Atty., Brian D. Simonson, Asst. Co. Atty., Hibbing, for respondent.

KELLEY, Justice.

Appellant Kenneth Kevin Richard Robinson was convicted and sentenced to life imprisonment for commission of first degree murder following the robbery and stabbing death of Clifford Enroth in Hibbing, Minnesota.[1] He appeals from the conviction alleging that he is entitled to a new trial because the trial court committed reversible error when (1) it failed to suppress appellant's custodial statement which had been taken by Spokane, Washington police officers after appellant had invoked, but had been denied, his constitutional right to counsel; (2) it failed to sustain the appellant's claim that the statement should be suppressed because his alleged waiver of Miranda rights was not knowingly, voluntarily, or intelligently made; (3) it erroneously admitted evidence of other crimes committed by the appellant; and (4) it refused to instruct the jury on appellant's claim that he had acted in self-defense. We affirm the conviction.

Clifford Enroth was robbed and stabbed to death in his Hibbing, Minnesota home during the early morning hours of August 6, 1986. Some days previously, appellant, Michael Merrill, Debra Chamblee, and another person arrived in Hibbing after driving from Oregon in a Toyota automobile belonging to Chamblee's former boyfriend. Shortly after arriving they rented an apartment. None of them were employed. During the course of the evening of August 5 appellant, Michael Merrill and Chamblee first met Clifford Enroth, a Vietnam veteran who had lost both of his legs as a result of war injuries, in a bar known as the Airway Inn in Hibbing. Following the initial introduction, the four socialized together for several hours playing darts, talking and drinking in the bar. Eventually Enroth invited the others to his home for the purpose of continued partying and also to take a sauna. En route to Enroth's home the four acquired tequila, vodka and a case of beer. Upon arrival at the house, the group initially resumed drinking, and smoked marijuana. Later they all took a sauna. Evidentially both Merrill and appellant "passed out". While those two were in a stupor, Enroth and Chamblee voluntarily engaged in a sexual act. After Cham-

---

1. Appellant was actually convicted of three counts of first degree murder in the stabbing death of Clifford Enroth, (first degree premeditated murder in violation of Minn.Stat. § 609.185(1); first degree felony murder while committing aggravated robbery in violation of Minn.Stat. § 609.185(3); and first degree felony murder while committing burglary in violation of Minn.Stat. § 609.185(3)). He was, however, only sentenced on the premeditated murder charge.

blee had confided to Enroth that Merrill continuously physically abused her, Enroth attempted to contact two battered women shelters by telephone in order to find a haven to which Chamblee could go to escape from that abuse. Though at that time he was unsuccessful, the two did arrange to meet the following day when Enroth would attempt to get her admitted to a battered women's shelter in Duluth.

Chamblee then awakened appellant and Merrill, and soon thereafter the three departed from Enroth's house. As they were proceeding back towards Hibbing, Merrill accused Chamblee of having had sexual intercourse with Enroth. In addition to making the accusations, he proceeded to slap her, grabbed her hair, and slammed her forehead into the dashboard. In an attempt to stem this abuse, Chamblee falsely related that Enroth had raped her with a dildo at gunpoint. This accusation infuriated Merrill, who was driving. He sharply turned the car around 180° and proceeded to return to Enroth's house. During the course of the trip back he asserted that he, Merrill, was going to kill Enroth.

Upon arrival, Merrill and appellant were re-admitted by Enroth. Merrill immediately accused Enroth of raping Chamblee. Enroth's denial of any wrongdoing infuriated Merrill to the point he commenced striking, kicking and ultimately knocking Enroth out of his wheelchair. While so engaged, Merrill also dispatched appellant to bring Chamblee, who had remained outside in the car, into the house.

Upon entry, Chamblee, fearing further beating at the hands of Merrill, instead of helping Enroth, likewise joined Merrill in slapping him while screaming and yelling accusations at him. However, shortly afterward she returned to the car outside, and thereafter actually observed none of the subsequent occurrences inside the house.

Meanwhile, while Chamblee was still in the house, appellant had secured a kitchen knife to "guard" Enroth while Merrill proceeded to ransack the house by placing jewelry, a camera, and other valuables into a pillowcase, ostensibly as retribution for the "rape" of Chamblee. Later, after Chamblee left the house, Enroth's guns were also taken. At one point during the course of his looting, Merrill admonished appellant to "slit" Enroth's throat.

When appellant and Merrill later joined Chamblee in the car, they brought with them a trash bag filled with items, such as beverage bottles and cans, that might contain incriminating fingerprints. They, likewise, brought with them the guns and other valuables removed from the Enroth's house. On the return trip to their Hibbing apartment, they disposed of the trash bag. At the apartment, the threesome quickly packed their few belongings into the Toyota and immediately left town heading for Spokane, Washington. Along the way, they sold some of the items filched from the Enroth house to pay expenses of the trip. After arrival in Spokane, some of the remaining loot was stored in the basement of a house occupied by appellant's sister. Appellant divulged to his sister that he and Merrill had had to depart Minnesota in a hurry because they had "beat up a guy" who had raped Chamblee.

Enroth's body was discovered two days after the assault. The physical evidence indicated that he had been stabbed while in his wheelchair which had been tipped over so he was on his back, unclothed, face up, with arms extended outward. Bloodstained pajamas were found nearby on the living room floor. Three knives were missing from knife blocks on the kitchen counter. In the bedroom, the telephone cord appeared to have been forcibly pulled from the wall. Personal items were strewn about Enroth's bedroom. The bedroom safe was found unlocked and empty, as was the gun case in the den.

Chamblee left Merrill and appellant in Spokane and went to Crescent, Oregon where her former boyfriend, the owner of the Toyota, lived. After learning from him that the police had been inquiring about the car, she contacted the Oregon police authorities and, ultimately, gave them a lengthy statement concerning her knowledge of the events leading to the robbing

of Enroth and his death. She also told the police where Merrill and appellant could be found in Spokane, Washington. Merrill and appellant were both arrested by Washington authorities the following morning. Following extradition both Merrill and appellant were duly indicted and convicted of first degree murder in Minnesota.[2]

1. We proceed first to consider appellant's contention that the trial court should have suppressed a detailed statement elicited from him during custodial interrogation on August 24, 1986, two days after his arrest, and after he had allegedly invoked his constitutional right to counsel.

The chronology of events leading up to the statement begins shortly after appellant's arrest at 6:20 a.m. on August 22. Detective James Lundgren of the Spokane Police Department first attempted to question appellant. Preliminarily, Detective Lundgren questioned appellant concerning a matter unrelated to the Enroth case. The inquiry, however, soon focused on the Minnesota case. Thereupon, appellant, who initially had been read his *Miranda* warnings and who had waived those rights, immediately stated that if he was a suspect in a murder, he wanted to consult with a lawyer. Even though Lundgren considered appellant's "request" to be equivocal, because appellant merely had opined that maybe he shouldn't say anything further, and that "maybe" he should talk to an attorney, nonetheless, he discontinued the interrogation. However, he took no steps to provide appellant with contact with an attorney nor did he permit appellant to place a telephone call.

Three hours later, and while appellant was still confined in the same interview room at the Spokane jail, he was approached by Detective Ronald Graves, also of the Spokane Police Department, who told appellant that Merrill had revealed most of the story about the Enroth affair. Graves then asked appellant if he wished to tell his side. Appellant likewise told Graves he wanted to make no statement,

and that he felt he should consult with an attorney. Detective Graves, as did Lundgren, felt appellant was undecided whether he wanted to counsel with an attorney. But, as had Lundgren, Graves, too, terminated the interview. Again, however, he made no attempt to provide an attorney to appellant, nor did he make any effort to afford appellant the opportunity to consult with counsel.

For more than 50 hours following his initial arrest, appellant was held in the Spokane County in-take facility on a "lockdown status." During that time he claims he was never afforded access to a telephone so he could call a lawyer. His request to call his sister was denied by police authorities.

Finally, at approximately 9 a.m. on August 24, 1986, Spokane County jailors took appellant to the booking area of the jail where he once again was approached to provide a statement relative to the death of Enroth. On this occasion, Detective Graves had been joined by Terry Jacobson, a Minnesota Bureau of Criminal Apprehension agent. As he had before, on this occasion appellant again stated that he should not talk with them and a Hibbing department police chief, and that he should talk with an attorney.

In prior contacts with the criminal justice system, to which appellant was not a stranger, his requests to counsel with a lawyer had been honored. In contrast, his remarks about consultation with counsel on August 22–24 in Spokane had been ignored. Therefore, having been isolated from contact with persons outside the jail for approximately two days, he concluded his best interests were served if he were to "talk." The result was a detailed statement, which, when transcribed, consisted of 27 typewritten pages. In this statement appellant admitted he had stabbed Enroth with a kitchen knife, but did contend that he had stabbed him in self-defense while struggling to wrest a pistol from Enroth's

---

**2.** Merrill was convicted of first degree felony murder. *See State v. Merrill*, 428 N.W.2d 361 (Minn.1988).

hands with which Enroth threatened to shoot him.

The trial court refused to suppress the statement at the omnibus hearing because it concluded appellant had failed to clearly and unequivocally assert his constitutional right to counsel. Instead, the trial court chose to credit the assertions of officers Lundgren and Graves that appellant was, or appeared to be, undecided about giving the statement without first consulting with a lawyer. Further, the court ruled that appellant had expressly waived his *Miranda* constitutional rights and had voluntarily given the statement.

■ Under Amendment V to the United States Constitution no person may be compelled to be a witness against oneself. No statement concerning an accused's connection with, or participation in, a crime adduced as the result of interrogation of the accused while in police custody is admissible at a subsequent trial of the accused unless the state can demonstrate that prior to giving the statement the accused knowingly and intelligently waived this fifth amendment right. *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). Likewise, before such a statement is admissible, the state must show that it was freely and voluntarily given. *See Haynes v. Washington,* 373 U.S. 503, 512–13, 83 S.Ct. 1336, 1342–43, 10 L.Ed.2d 513 (1963); *State v. Campbell,* 367 N.W.2d 454, 458 (Minn.1985); *State v. Kivimaki,* 345 N.W.2d 759, 762 (Minn.1984); *State v. Linder,* 268 N.W.2d 734, 735 (Minn.1978).

■ Admissibility of a statement given by an accused to police authorities is usually determined at a pre-trial hearing. Minn. R.Crim.P. 11.02. Even though at the hearing the trial court has made a subjective factual inquiry into the circumstances surrounding the giving of the challenged statement, and notwithstanding the general practice rule that an appellate court will only reverse findings leading to admissibility if it finds them to be clearly erroneous, it is the function of a reviewing court to independently determine the voluntariness of the statement on the facts as found.

*See, e.g., State v. Hardimon,* 310 N.W.2d 564, 567 (Minn.1981).

Pivotal to resolution of appellant's claim that his August 24 statement was involuntarily given, and, therefore, inadmissible is whether, prior to giving the statement, he had effectively invoked his right to assistance of counsel. On August 22, the day of his arrest, when Detectives Lundgren and Graves made separate attempts to secure a statement, on each occasion appellant testified he informed each he thought he should talk to a lawyer. Each officer conceded that appellant had expressed a desire to secure the advice of an attorney, although each testified that in his opinion the request was equivocal. In our view, however, the reactions of each officer following appellant's request, no matter how equivocal they subsequently testified they considered appellant's request to be, speaks louder than their testimony. On each occasion, the interrogation ceased immediately after appellant opined that he should consult a lawyer. It would obviously appear that at the time, each officer recognized that appellant was asserting his right to counsel. At no time while in the custody of Spokane authorities did appellant initiate further communications or conversations with either them or with the Minnesota authorities. Spokane police authorities instigated all questioning attempts including the one leading up to the challenged statement.

At least since *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), it has been clear that custodial interrogation initiated by police after an accused has invoked his right to counsel violates an accused's fifth amendment right, and any statement or confession ensuing as the result of that interrogation may not be introduced in evidence at the trial of the accused. In *Edwards* the court indicated the request for counsel must be clear and unequivocal. *See Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

Three types of analysis of the clarity requirement have surfaced since *Edwards.* A few jurisdictions have opted for employment of a "strict" or "bright line analysis."

In those jurisdictions, no matter how equivocal or ambiguous a request for, or even a reference to, counsel may be, further questioning of the suspect must cease. *See, e.g., People v. Superior Court of Mono County,* 15 Cal.3rd 729, 735–36, 542 P.2d 1390, 1394–95, 125 Cal.Rptr. 798, 802–03 (1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976); *Ochoa v. State,* 573 S.W.2d 796, 800–01 (Tex.Crim.App. 1978).

A number of jurisdictions, possibly the majority, have rejected the "per se bright line" approach. Instead, the courts examine the issue by looking at the "totality of the circumstances." Under that approach, although the right to counsel may be triggered by an accused's assertion that is somewhat less than explicit, equivocal or clear, it is not necessarily invoked by every reference to a lawyer by an accused. *See, e.g., People v. Krueger,* 82 Ill.2d 305, 311, 45 Ill.Dec. 186, 189, 412 N.E.2d 537, 540 (1980). This analysis is essentially the one we employed in *State v. Howard,* 324 N.W. 2d 216, 221–22, *cert. denied,* 459 U.S. 1172, 103 S.Ct. 818, 74 L.Ed.2d 1016 (1983), (Minn.1982), where we rejected an accused's claim that he had clearly and unequivocally invoked his right to counsel when, following his equivocal comment that could have been interpreted as a request for counsel, he answered "I guess not" when he was directly and specifically asked if he wanted to talk to an attorney. *See also Muhammed v. State,* 316 N.W.2d 572 (Minn.1982). We likewise have looked at the totality of the circumstances in *State v. Campbell,* 367 N.W.2d 454 (Minn.1985) where the accused suggested that "maybe I should talk to an attorney." We disagreed with her contention that this equivocal statement was sufficient to invoke her right to counsel.[3]

Other jurisdictions employ a third type of analysis. This approach substantially appears to be a correlation to, or refinement of, the second. Courts in these jurisdictions employ a rule that if an accused's equivocal comment "arguably" can be construed as a request for counsel, all further interrogations must promptly cease except that further limited narrow questions designed to "clarify the earlier comment and to ascertain the accused's true desires respecting the aid of counsel" may be asked by interrogators. *See, e.g., Thompson v. Wainwright,* 601 F.2d 768, 771–72 (5th Cir. 1979); *State v. Moulds,* 105 Idaho 880, 888, 673 P.2d 1074, 1082 (Idaho App.1983). *See generally Smith v. Illinois,* 469 U.S. 91, 96 n. 3, 105 S.Ct. 490, 493 n. 3, 83 L.Ed.2d 488 (1984).

 It appears to us that this third approach is more reasonable, pragmatic and fairer to the accused as well as the state than the "per se bright line" approach, or the less precise "totality of circumstances" analysis. We hold, therefore, that when a suspect indicates by an equivocal or ambiguous statement, which is subject to a construction that the accused is requesting counsel, all further questioning must stop except that narrow questions designed to "clarify" the accused's true desires respecting counsel may continue.[4] Although neither officers Lundgren nor Graves attempted to continue interrogation of Robinson on August 22, they did testify that they felt that appellant was "undecided" whether he wanted counsel, and, in fact, they did again approach appellant with agent Jacobson on August 24 at which time the statement was taken. Even those officers concede that, however equivocally, appellant did indicate that he thought he should talk with a lawyer. The dispute is whether that indication was sufficiently clear to give rise to the

---

**3.** Our actual holding in *Campbell* was that even if her comment had been sufficient to invoke her right to counsel, she had herself waived the right by initiating further communications with public authorities. *Campbell,* 367 N.W.2d at 459. *Accord Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

**4.** We note this procedure was not specifically enunciated in *Howard.* However, this rule was

substantially followed in that case. There Howard made a remark which could have been interpreted as a request for counsel. Thereupon, the interrogating officers ceased interrogation concerning the crime itself but did ask a few more questions for the purpose of ascertaining Howard's true intent until Howard had clearly indicated he was not requesting counsel. *See Howard,* 324 N.W.2d at 220–22.

*Edwards* prohibition to further questioning. Had the Spokane officers followed the third approach and directed their questions thereafter toward establishing clearly the accused's true desires,[5] the trial court would not have had to base its admissibility ruling, as it did, solely on an analysis of the credibility of interested witnesses.

■ In our view, considering all the circumstances surrounding appellant's detention and questioning in the Spokane jail, appellant was clearly denied his right to counsel. Even disregarding the Spokane officers' subjective characterization of appellant's desire to consult with an attorney as being "undecided," their remaining testimony, corroborated in each instance by the reaction of each following appellant's expression by termination of further questioning, supports the conclusion that appellant's expressed wish to consult with a lawyer was manifested with sufficient clarity to meet the *Edwards* test. Additionally, appellant had been retained in prolonged police custody without being afforded counsel, or being permitted to contact relatives or friends outside the jail thereby creating a presumption of coercion. *See, e.g., Arizona v. Roberson,* — U.S. —, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Accordingly, we hold that appellant's constitutional right to consult with counsel was violated, and agree with his assertion that the trial court erred in refusing to suppress the August 24, 1986, statement.

■ However, a determination that the trial court erred in admitting the statement does not *per se* result in reversal of the conviction for a new trial. The conviction may stand, notwithstanding the violation of Robinson's fifth amendment right to counsel by Spokane authorities, provided that the admission of the statement was harmless beyond a reasonable doubt. The federal harmless constitutional error doctrine was first formulated in *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). We apply a similar rule. *See, e.g., Howard,* 324 N.W.2d at 222. An appellate court's function when faced, as here, with a claimed violation of an accused's constitutional right must independently evaluate the evidence to determine whether or not an average jury would have changed its verdict had the questioned statement been excluded. *See Schneble v. Florida,* 405 U.S. 427, 431–32, 92 S.Ct. 1056, 1059–60, 31 L.Ed.2d 340 (1972). *See generally* Goldberg, *Constitutional Sneak Thief,* 71 J.Crim.L. & Criminology 421, 426 (1980). In determining whether the error was prejudicial to the result, a federal appellate court focuses its inquiry on a consideration of the record as a whole. *See Fahy v. Connecticut,* 375 U.S. 85, 87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963). Appellate Courts in Minnesota follow the same rule. *See, e.g., Watts v. State,* 305 N.W.2d 860, 862 (Minn.1981); *State v. Herem,* 384 N.W.2d 880, 884 (Minn.1986) (the record furnished failed to establish prejudicial error). In employment of the harmless error analysis, the error should not be considered in isolation but rather in the broader context of all of the facts appearing in the record. If the record contains overwhelming evidence of guilt, and the statement was merely cumulative and could not have played a significant role in the jury's conviction, it is harmless. *State v. Forcier,* 420 N.W.2d 884, 886–87 (Minn.1988); *Howard,* 324 N.W.2d at 221–23.

---

5. We observe that it appears that many similar disputes arising from an accused's claim of denial of constitutional rights could be obviated if police interrogators would record all conversations with the accused relative to the accused's constitutional rights as required by *Miranda v. Arizona.* Most often these disputed claims arise from conversations allegedly occurring between officers and the accused as a preliminary matter before the commencement of the actual interrogation, which today is frequently electronically recorded. Thus, in the interest of assuring that the accused's rights have been observed as well as validating the integrity of the actual interrogation, recordation of all pre-statement conversations would afford the reviewing court an objective record upon which to rule, rather than one based upon self-serving or subjective assertions of the principals involved. Not only will recording of pre-statement conversation promote the integrity of the process, in our view, such procedures will minimize the subsequent assertion of questionable claims of denial of constitutional rights as well as claims of unknowing or involuntary waiver of such rights.

■ We commence our harmless evidence analysis by observing that the evidence of appellant's guilt, exclusive of his statement of August 24, was overwhelming. Without reference to the statement itself, the record is replete with unrebutted, and usually corroborated, evidence clearly demonstrating that Clifford Enroth was murdered in his home on August 6, 1986, as the result of a stabbing personally inflicted by the appellant. The evidence likewise clearly documents appellant's movements from the time he first met Enroth at the Airway Inn until the time of his arrest in Spokane, Washington. Several testifying witnesses observed appellant with Chamblee, Merrill and the victim, and noted that appellant made statements he knew Enroth had guns at his home, and that the four were going to continue their partying in that home. Chamblee's testimony that after partying and initially leaving the Enroth home, the three returned to it when Merrill and appellant re-entered the home where they robbed and physically assaulted Enroth is unrebutted, and, in essence is corroborated by other evidence. For example, in addition to her testimony of the robbery, evidence exists that Robinson and Merrill financed their trip from Hibbing to Spokane, Washington, in part at least, by selling some of the loot; that they had stored some of the stolen items in appellant's sister's house; that they had sold some, and attempted to sell other items; and shortly before his arrest in Spokane, Robinson had in his possession an antique Spanish shotgun belonging to Clifford Enroth.

No doubt exists that appellant actually stabbed Enroth, nor that the stabbing resulted in the victim's death. Chamblee testified that during the short time she was in the Enroth home the second time, appellant was "guarding" Enroth at knife point. Scientific and forensic evidence established that Enroth had been stabbed with a steak knife type weapon while lying on his back in the upset wheelchair. At the time of the stabbing only Merrill and appellant Robinson were in the house with Enroth. Though appellant testified at the trial, he never there, nor at any other time, made any claim that Merrill had stabbed Enroth. Indeed, he testified to the contrary, and admitted he had done so, but did assert that the stabbing had occurred in self-defense. Moreover, in admissions made by appellant to his sister in Spokane and to fellow inmates in the St. Louis County jail, he respectively admitted that he had beat up a man in Minnesota "pretty bad," that he "killed a man" who was a "Viet–Nam veteran," and that he had "offed a guy in Hibbing." None of these volunteered statements by appellant was prompted by, nor the result of, his August 24 interrogation.[6] This overpowering mass of largely uncontradicted evidence leaves us with no doubt that even had the August 24 statement not been admitted in evidence, the average jury would have arrived at no conclusion other than that of guilt.

The only point at which the August 24 statement conflicted with the evidence introduced which pointed inevitably to appellant's guilt of first degree premeditated murder was his claim, asserted both in the statement and later at trial, that the stabbing was done in self-defense while he attempted to wrest a pistol which, he claimed, Enroth had somehow secured and with which he threatened to shoot appellant. The state produced evidence which, if not completely demolishing that claim, cer-

6. Appellant argued neither before this court nor the trial court that the trial court's ruling refusing to suppress the statement compelled him to take the stand and thus furnish evidence against himself. Even had the assertion been advanced, it would have been meritless. At the Omnibus Hearing, before the trial court had ruled on the suppression motion, appellant, through counsel, gave notice that appellant was claiming intoxication and self-defense. It is difficult to comprehend how either defense, given the circumstances existing in this case, could have been asserted without appellant himself taking the stand at the trial.

Though the fact was unknown to the jury which convicted appellant and therefore could have played no part in the jury's determination (nor in our review of the trial record), we do note that appellant voluntarily signed a document admitted in a post conviction hearing in *State v. Merrill*, 428 N.W.2d 361 (Minn.1988). In that document, he likewise admitted it was he who had stabbed Enroth on August 6, 1986.

tainly justified the jury's rejection of it. Terry Laber, laboratory analyst with the Minnesota Bureau of Criminal Apprehension, gave expert testimony from examination of the body, blood stains and blood spatters. From his examination, he concluded Enroth had been twice stabbed in the chest after he had already been tipped over in his wheelchair, and that it was physically impossible from the bloodstains and spatters for Enroth to have been wheeled any place after he was stabbed (appellant claimed he had stabbed Enroth in self-defense near the front door after which Enroth had been wheeled to the kitchen table where he was found). Moreover, Dr. Roberta Zimmerman, a pathologist trained in forensics, observed no defensive wounds on Enroth's hands or arms and she, too, shared Laber's opinion that Enroth had been stabbed near the kitchen table. The jury simply did not believe Robinson's story of self-defense when considered relative to the testimony of these experts. Presumably, the claim, as well as the evidence rebutting it, would have been the same whether or not the August 24 statement was suppressed.

Accordingly, even though we hold the trial court's failure to suppress the August 24 statement given by appellant to police authorities violated his constitutional rights, it is clear to us, after carefully scrutinizing the record, that the error was harmless beyond any reasonable doubt.

■ 2. Alternatively to his first claim, appellant asserts the trial judge erred when it failed to suppress the August 24, 1986, statement because appellant had not voluntarily, knowingly, and intelligently waived the constitutional rights afforded an accused by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As we have noted, the record demonstrates that appellant did assert his right to counsel prior to custodial interrogation. He acceded to questioning by the officers only after it became apparent to him that he was to be denied that right. Therefore, even if his submission to questioning can be considered to be a waiver, it cannot be said to have been voluntary. Nonetheless,

when considered in conjunction with the overwhelming evidence of guilt, our holding that admission of the statement was harmless error beyond a reasonable doubt obviates further consideration of this assertion.

■ But in addition to affording the right to counsel, *Miranda* also requires that an accused in custody before questioning be warned of his right to remain silent as well as that any statement he gives may be used in evidence against him. In a suppression hearing, once it has been established that the accused has been advised of his rights and has indicated that he understood and appreciated the rights, a statement resulting from subsequent interrogation is admissible absent other evidence to the contrary. *See, e.g., State v. Lee,* 298 Minn. 546, 214 N.W.2d 345 (1974). Appellant makes no claim that he didn't understand nor appreciate these additional rights. Instead, he bases his contention almost solely on his denial of counsel, the length and nature of his detention, and limitations on communication with family and friends.

■ In general, we examine the totality of circumstances in analyzing this type of claim. *See, e.g., State v. Linder,* 268 N.W. 2d 734 (Minn.1978). The validity of assertions of unknowing, involuntary or unintelligent waiver depends upon particular existent facts. *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). The record reveals appellant to be intelligent, and also to possess an astute ability to comprehend the facts of the situation. He was not inexperienced in his contacts with the criminal justice system, and had been informed of his rights as an accused on the occasion of those prior contacts. In the Spokane jail he was afforded the *Miranda* warnings at least four times before agreeing to give the statement. None of the attempts to question him nor the actual interrogation by police authorities was in any way physically coercive. Likewise there was an absence of "trickery" on the part of the officers. We are convinced by the record evidence that appellant knowingly, voluntarily, and intelli-

gently waived his right to silence, and, gave the statement knowing it might be used in evidence against him.

3. The state gave appropriate notice of intention to present evidence of two prior incidents involving appellant for the purpose of establishing a common modus operandi. *See, e.g., State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965); *State v. Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967). Following a separate hearing conducted outside the hearing of the jury, the trial court, over objection, admitted the evidence. Appellant claims that because the prejudicial effect of the evidence admitted exceeded its probative value, the trial court abused its discretion by admitting it, and therefore should be reversed.

The first incident involved an alleged Arizona assault in March, 1985. At the time one Todd Jacob Huberty, with appellant, who was using the name Carl Roessler, and others were hitching a ride on a train in Yuma, Arizona. While Huberty was sleeping, someone threw a piece of metal at him striking him in the head and cutting him. Huberty and appellant stood up and Huberty asked who had done that, to which appellant replied, "You're dead." Appellant then stabbed Huberty twice with a hunting knife, a blade four or five inches long that appellant had been wearing on his side. Hubert was stabbed under his right arm and in the groin. Huberty broke free and jumped from the moving train. During the course of altercation, his wallet was stolen. Huberty later clearly identified appellant as his assailant. Appellant, in fact, admitted he had stabbed Huberty, but, as here, claimed he did so because he thought Huberty was going for a weapon. On this occasion appellant also admitted stealing items from a bag Huberty had left behind when he jumped from the moving train. Arizona authorities charged appellant with attempted murder and armed robbery, but before trial, Huberty had left the area in Arizona, and eventually the indictments were dismissed.

Three months later in another railroad yard in Oregon, appellant and two others assaulted Melvin Laible leaving him with a broken nose, a stab wound to his hand, and other cuts and abrasions. During that assault Laible's wallet and duffel bag were stolen. Following appellant's guilty plea of second degree robbery, he was sentenced to and did serve time in the Oregon State Prison.

Generally, appellate courts will uphold a trial court decision to admit such prior crime evidence. *State v. Ture*, 353 N.W.2d 502 (Minn.1984), but the trial court must find the probative value of the evidence outweighs any potential "unfair prejudice." *Billstrom*, 276 Minn. at 178–79, 149 N.W.2d at 284–85.

■ We are satisfied that the trial court did not abuse its discretion in this case. The evidence shows a pattern of operation. Appellant was claiming special defenses of self-defense and intoxication here. In both of the other instances, he claimed defenses of intoxication, and in one of them he claimed self-defense. This evidence demonstrates that similar defenses had been urged by him under similar circumstances involving assaults and robberies from the victim, and after apprehension, assertion of similar defenses. The three incidents, excluding time appellant was in prison, occurred very close together in time. The evidence tends to show absence of mistake or accident in charging appellant with commission of the current charges. Under strikingly similar circumstances, we have in the past upheld orders admitting similar evidence. *See, e.g., State v. Brant*, 345 N.W.2d 248–49 (Minn.1984); *State v. Scott*, 323 N.W.2d 790, 793 (Minn. 1982); *State v. Almengor*, 310 N.W.2d 554, 555 (Minn.1981).

4. Lastly, appellant contends that his testimony that he stabbed Enroth in self-defense was sufficient to meet his threshhold burden of going forward with the evidence on this issue. Therefore, he asserts he was denied due process of law when the trial court refused to instruct the jury on self-defense.

■ An original aggressor in an incident out of which a self-defense claim is asserted, is entitled to an instruction on self-defense only if he actually and in good

faith withdraws from the conflict and communicates that withdrawal to the intended victim. *Bellcourt v. State*, 390 N.W.2d 269, 272 (Minn.1986).

A self-defense instruction was justified in this case only if a reasonable juror could have found that appellant, at the time of the stabbing, had withdrawn from the confrontation. *Bellcourt*, 390 N.W.2d at 272–73. Clearly there was no withdrawal in the instant case. When Enroth was stabbed, appellant was "guarding" him at knife point. Enroth had endured beatings and assaults by appellant's accomplices. The undisputed physical evidence concerning the blood flow and splatters conclusively rebuts appellant's story. Appellant does not assert he ever put down the knife he held while "guarding" the victim during the time Merrill was ransacking Enroth's house for guns, cameras, jewels and other valuables. After the stabbing, appellant actively joined Merrill in stealing the victim's property, and in attempting to cover up the crime by removing "trash" which might prove to be incriminating. Because no credible evidence existed showing that appellant had withdrawn from the confrontation with Enroth, the trial court did not err in denying a requested instruction on self-defense.

Accordingly, the appellant's request that his conviction be reversed and that he be granted a new trial is denied. Judgment affirmed.