**STATE of Minnesota, Respondent,**

v.

**JoAnn HENNUM, Appellant.**

**No. C5–87–1524.**

Court of Appeals of Minnesota.

Sept. 13, 1988.

Review Granted Nov. 23, 1988.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., Bruce L. McLellan, Law Clerk, St. Paul, Jerome A. Schreiber, Wabasha Co. Atty., Lake City, for respondent.

C. Paul Jones, State Public Defender, Michael F. Cromett, Asst. Public Defender, St. Paul, for appellant.

Considered and decided by FOLEY, P.J., and NORTON and IRVINE,* JJ., without oral argument.

## OPINION

L.J. IRVINE, Judge.

JoAnn Hennum appeals her conviction for second degree felony murder. Based on the trial court's order compelling an adverse mental examination of the defendant by the state, and errors accumulating as a result thereof, we reverse and remand for a new trial.

## FACTS

JoAnn Hennum and Robert Hennum met in a Rochester bar in 1973. JoAnn had five children by a prior marriage; these children lived with her. Robert Hennum moved in with JoAnn and her children three or four months later. They were married in 1976. During the ensuing years, the Hennums moved frequently. In November 1986, they moved to a rented trailer home in rural Hammond, Minnesota.

On Thursday evening, November 27, 1986, some of the Hennums' neighbors stopped by the Hennums' trailer with their children. The visitors' children, including 8–year–old Jada Schoenfelder, were allowed to sleep overnight at the trailer.

The following day, Robert Hennum left the trailer for a day of work mixed with drinking. When Robert returned home that evening at about 11:30 p.m. (he had been in and out of the house on a number of occasions during the day), Jada was asleep (along with four other children) on the floor of the trailer. Robert was drunk.

Robert Hennum immediately began to verbally abuse JoAnn Hennum and then began physically abusing her. He swore at her and dumped cold cooked oatmeal over her head. Jada was awakened by this fighting.

---

* Acting as judge of the court of appeals by appointment pursuant to Minn. Const. art. VI, § 2.

Robert then threw cans of food at JoAnn, ripped her shirt off, grabbed her by the throat, and held her on the floor. When JoAnn was attempting to cook dinner for Robert, he threw a piece of firewood, a piece of a car, and a chair at her.

JoAnn's six-month old grandson also awoke at the sound of the fighting. The baby began crying. Robert Hennum told the baby to shut up and go to sleep. Eventually, when the child would not stop crying, Robert pulled the child up by the arm and said something to the effect of "you shut up you little brat." Robert then put (or threw) the child on the couch. He attacked JoAnn again, pulling her by the hair. He then tore one of the cabinet doors off the closet and threw it at her. Robert also threw a rocking chair at her, broke a cupboard to pieces, and threw another piece of firewood. He also hit JoAnn in the leg with his hand.

Jada had been watching this fight, and testified that JoAnn said something Robert did not like. JoAnn indicates she told Robert that all he was good for was beating up on women and children, and that he could not handle another man. Jada said she had never seen Robert as mad as he was that night.

During the course of the continuing fight, Robert grabbed JoAnn by the throat again, finished tearing off her shirt, and pulled out more of her hair. Robert then went to the bathroom, and Jada sat by JoAnn.

JoAnn put on another shirt and began to clean up. Jada testified that JoAnn tried to load a 12 gauge shotgun JoAnn retrieved from the closet. Robert came out, asked what she was doing, and took the gun apart. Robert then either watched television or sat on the couch. A short time later, he went to bed and fell asleep.

Jada testified that JoAnn then called her out to the kitchen. JoAnn told her she was going to go startle Robert so he would not beat her any more. According to Jada, JoAnn showed her how she loaded a .30–30 rifle with one of the two bullets she had retrieved. JoAnn placed the second bullet in her shirt pocket. JoAnn then sat at the kitchen table and drank "several" cans of beer. While drinking beer and sitting with Jada, JoAnn went to the bathroom on three occasions. Before the last trip to the bathroom, she told Jada to sit on the couch with the baby. After hearing the bathroom light switch go on and off, Jada heard the bedroom light switch go on and a gun go off.

JoAnn's testimony was contradicted by Jada's on a number of specific facts. JoAnn testified that she picked up the loaded rifle off the living room floor, and went into the bedroom to scare her husband with the rifle. JoAnn testified that when she retrieved the gun it was already loaded, and that she did not know how to load the gun. She also testified that she did not drink anything between the time of picking up the gun and going in to scare her husband. After entering the bedroom, she closed her eyes after pointing the gun, turned her head, and fired the gun.

JoAnn then walked to the neighbor's house to report what she had done. She, along with Jada and the baby, arrived at the neighbor's house about 4:00 a.m. She called Jada's mother, who came, with her husband, to where JoAnn was. They then proceeded to the Hennums' trailer. They found the interior of the trailer in a state of disarray from the earlier fight, and Robert dead of a gunshot wound. The sheriff was called, and he arrived with two deputies at about 5:55 a.m. The officers questioned JoAnn for about two hours. During questioning and throughout the trial, JoAnn maintained that she had gone into the bedroom to scare Robert with the gun; that, when entering the room, she pointed the gun, turned her head, and pulled the trigger. JoAnn was arrested and transported to jail.

JoAnn was examined by a doctor on November 29. She was found to have multiple abrasions, bruises, and a contusion on the right, back side of her head. These were all quite recent injuries.

The bullet that killed Robert was fired from the .30–30 rifle found in the trailer. The wound was consistent with having

come from a distance of more than 18–24 inches.

When he died, Robert had a blood alcohol concentration of .25. The gunshot severed his brain stem, causing instantaneous death. He also suffered from an alcohol-related liver disease. At the time of his death, Robert weighed 185 pounds and was 6 feet 2 inches tall. He was 36 years old. JoAnn was 5 feet 4 inches tall and was overweight. She was 46 years old.

On December 22, 1987, JoAnn was indicted by the Wabasha County Grand Jury with two counts of murder in the second degree. Count I charged intentional murder in violation of Minn.Stat. § 609.19(1); Count II charged felony murder in violation of Minn.Stat. § 609.19(2).

Prior to trial, the defense argued that it should be allowed to introduce evidence of "battered women's syndrome." In the context of a self-defense claim, which JoAnn asserted at trial, this information would assist the trier of fact in determining the reasonableness of the defendant's fear at the time she acted. *See State v. Boyce*, 284 Minn. 242, 253, 170 N.W.2d 104, 112 (1969) (one element of self-defense is reasonableness of defendant's response under the circumstances). In its March 9, 1987 pre-trial order, the court determined that JoAnn could offer evidence of battered women's syndrome, but only on condition that she submit to an adverse medical examination by an expert appointed by the state for purposes of possible rebuttal. In its memorandum attached to this order, the trial court explained the reasoning behind its decision:

> The court has determined not to preclude, *as a matter of law*, the defense or theory of self-defense. However, it is apparent from the offers of proof made in support of admissibility of the battered women syndrome, that the state of mind and subjective beliefs of the defendant prior to and at the time of her act is integral to her self-defense theory. Therefore, in order to have a fair opportunity to rebut it, the State should be entitled to have its own expert examine the defendant. The Order further provides that the defendant's expert, Dr. Lynn Powers, is permitted to be present and observe the examination conducted by the state's expert; and the defendant is entitled to immediate discovery of the findings, opinions and conclusions of the State's expert, and their factual bases.

(Emphasis in original.)

At trial, JoAnn offered testimony of psychologist Lynn Powers regarding battered women's syndrome. Essentially, the syndrome provides an explanation of the seemingly incongruous behavior of victims of domestic abuse—why they believe that they cannot safely and effectively leave the situation of abuse. Powers testified regarding the profile of a battered woman; according to this profile, a battered woman is often an individual who fills traditional female roles and possesses traditional female values. Such an individual often suffers from low self-esteem and a sense of helplessness, often feeling that there is nothing she could do to interrupt the pattern of abuse by the batterer. A highly charged emotional situation often results. Sufferers of the syndrome are unable to predict when the next violence will occur, although they do learn cues which often precede the battering. Powers testified that JoAnn was suffering from a relatively severe case of this syndrome.

In rebuttal, the state presented the testimony of Dr. Sharon B. Satterfield, a psychiatrist who had conducted the court-ordered adverse psychological examination. This examination took place, over defense counsel's objection, during trial, after the court determined it would let JoAnn's expert testify. The state's witness testified JoAnn did not fit the battered women's syndrome, even assuming Powers' profile was correct. She further testified that JoAnn was emotionally disturbed and was suffering from alcohol dependence, psychoneurotic depression, and an anti-social personality disorder. As a factual basis for these diagnoses, she testified to a number of past acts of the defendant, including: a long history of suicide attempts (dating from adolescence), a long history of drug and alcohol abuse (again, dating from ado-

lescence), a juvenile court appearance, abortion attempts, two instances of driving while intoxicated, and an inability to adequately care for her children (who, at times, almost all experienced some variety of out-of-home placement).

At trial, JoAnn testified at length regarding numerous violent acts committed against her by Robert during the course of their relationship. The broad spectrum of violence included Robert ripping numerous phones off walls, punching holes in walls, strangling the children's kitten (in front of the children), shooting dogs for failing to obey him, hitting the children abusively, and ripping clothes off of JoAnn when he disliked those clothes. He also shot all the lawn ornaments on another occasion, and smashed almost all of JoAnn's personal possessions at one time or another. She also testified to ongoing forced sexual acts committed by Robert against her; Jada had earlier testified that Robert also had sexually abused her on one occasion several months earlier.

The most serious incidents of direct violence towards JoAnn included the following:

*May 15, 1977.* JoAnn taken to a hospital with contusions and scratches on her face and a punctured lung caused by a blow to her ribs. Hospital staff informed her of social service agencies which could help her with the abuse. She did not contact these agencies at this time. She moved to Florida to stay with a sister, but she eventually moved back in with her husband.

*July 2, 1979.* Robert attacked JoAnn by kicking her with steel-toed boots, causing a ruptured spleen. Surgery and subsequent hospitalization were required. She returned to living with her husband after two or three weeks.

*July 17, 1982.* JoAnn entered hospital after being hit in the face with a beer bottle by Robert. She spent the next five days at a women's shelter, where she learned of various programs to help battered spouses. A restraining order was issued in August, pursuant to her request.

*March 1985.* Robert Hennum arrested as a result of another attack on JoAnn. He pleaded guilty to assault.

The trial court also admitted evidence of several prior bad acts in which JoAnn was involved. The jury was cautioned to view the evidence of JoAnn's prior violent conduct as bearing only on the testimony of the two experts who testified about JoAnn's mental state.[1] Those incidents are as follows:

*November 25, 1979.* A deputy sheriff responded to a call at the Hennum residence. After putting Robert in the car, the officer approached JoAnn, who trained a loaded shotgun on the officer. The safety was off. She continued to train the shotgun on the officer while he talked to her, although she eventually dropped that stance. In speaking with the officer, JoAnn made violent comments about her husband, including threats of death.

*September 1984.* Robert was staying at another couple's house. JoAnn came to the house at about midnight, accusing Robert of having an affair with the sister of one of the residents of the house. JoAnn approached Robert (who was sleeping on the kitchen floor) and began kicking him and hitting him with her purse.

*Spring 1985.* Another witness told of an incident JoAnn had related to her at an earlier date. JoAnn told her she shot at Robert from inside her house. The witness testified that JoAnn stated that she said she wanted to kill Robert at that time. The witness also testified that JoAnn told her numerous times over a two-year period that JoAnn wanted to see Robert dead.

*September 10, 1986.* JoAnn drove to a neighbor's house and accused the neighbor of having an affair with Robert. JoAnn approached the neighbor with a beer bottle

---

**1.** These incidents were brought up during the testimony of JoAnn's expert witness. During cross examination, the state brought out the fact that JoAnn had never told the expert testifying on her behalf about any of these incidents. JoAnn's expert testified that knowledge of these events would have an impact on the evaluation she conducted, although she was not directly asked whether this would change her final conclusions.

in hand. A fight between the two women ensued.

The trial court, after receiving proposed instructions from both parties, instructed the jury on counts I & II, and on the law of self-defense. The jury found JoAnn guilty of second degree felony murder (count II), but not guilty of intentional murder (count I).

JoAnn then made a motion for a new trial. In addition to the issues decided adversely to her at trial, the motion alleged prosecutorial misconduct in failure of the prosecutor to disclose exculpatory evidence. The trial court, after reviewing these claims, found that the evidence complained of was not exculpatory, and that the defense had been aware of the evidence.

Following a presentence investigation (PSI), the trial court imposed a sentence of 102 months, a sentence on the low end of the presumptive guidelines sentencing range. The court did this despite the fact that the PSI recommended a downward departure to 54 months.

### ISSUES

1. Did the trial court erroneously instruct the jury on the law of self-defense?

2. Did the trial court err in ordering an adverse medical examination as a condition of presentation of testimony regarding battered spouse syndrome?

3. Did the trial court err in allowing testimony of the state's expert witness relating to appellant's failure to answer questions posed by that witness?

4. Did the trial court abuse its discretion in its admission of four separate *Spreigl* prior bad acts?

5. Did the trial court err in its failure to give, sua sponte, a jury instruction on manslaughter?

### ANALYSIS

1. The court's charge to the jury must be read as a whole. *State v. Anderson,* 261 Minn. 431, 435, 113 N.W.2d 4, 7 (1962). If the charge on a particular issue correctly states the law in language that can be understood by the jury, there is no reversible error. *Id.*

The defendant making a self-defense claim has the burden of going forward with enough evidence to support her claim of self-defense. *State v. Columbus,* 258 N.W.2d 122, 123 (Minn.1977). Once the defendant has met this burden, the burden of proof is on the prosecution to satisfy the factfinder beyond a reasonable doubt that the actions of the defendant were not justifiable. *Id.*

The doctrine of self-defense is codified at Minn.Stat. §§ 609.06 & 609.065 (1986). Because deadly force was used in this case, Minn.Stat. § 609.065 ("Justifiable Taking of Life") controls:

The intentional taking of the life of another is not authorized by section 609.-06, except when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death, or preventing the commission of a felony in the actor's place of abode.

Judicial interpretation of the law of self-defense indicates:

It is a general rule that the legal excuse of self-defense is available only to those who act honestly and in good faith. The rule requires (1) the absence of aggression or provocation on the part of the slayer; (2) the actual and honest belief of the slayer that he was in imminent danger of death, great bodily harm, or some felony and it was necessary to take the action he did; (3) the existence of reasonable grounds for such belief; and (4) the duty of the slayer to retreat or avoid the danger if reasonably possible.

*State v. Johnson,* 277 Minn. 368, 373, 152 N.W.2d 529, 532 (1967). The supreme court later clarified the requirements needed to justify the use of deadly force under the statute:

At least three conditions must concur to excuse or justify homicide under §§ 609.06 and 609.065:

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*State v. Boyce*, 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969).

JoAnn asserted self-defense at trial. The testimony of her expert related to the reasonableness of the course of conduct she chose in shooting her husband. The trial court instructed the jury as follows on the law of self-defense:

> You are instructed that no crime is committed when a person takes the life of another person intentionally or unintentionally if the Defendant's action causing the killing is taken in resisting or preventing an offense which she reasonably believes exposes her or another to death or great bodily harm. In order for a killing to be justified for this reason, three specific conditions must be met. First, the lethal act must have been done in the belief it was then necessary in order to avert death or great bodily harm to the Defendant or another. Second, the judgment of the defendant as to the gravity of the peril to which she or another was exposed must have been reasonable under the circumstances. Third, the Defendant's election to defend herself in such manner must have been such as a reasonable person would have made in light of the danger *he* perceived and considering the existence of an alternative way of avoiding the peril.

(Emphasis added.)

On appeal, JoAnn objects to the instruction under a number of different theories.

a. *Subjective standard of self-defense.*

■ JoAnn submitted a proposed instruction to the trial court which would have applied a subjective standard to her self-defense claim. Essentially, this standard would have focused on the reasonableness of the behavior from the defendant's point of view, i.e., "seeing what she saw and knowing what she knows."

Minnesota law, however, does not apply an exclusively subjective standard. *Boyce* provides both subjective and objective elements. The first element of the defense (killing must have been done in the belief that it was necessary to avert death or grievous harm) addresses the actual belief of the defendant. The second element of the defense (judgment as to gravity of peril must have been reasonable under the circumstances) appears to provide a mixture of subjective and objective determinations; reasonableness implies an objective standard, and the language "under the circumstances" implies that, as in this case, one would look to the circumstances the defendant found herself in when coming to the judgment regarding the danger she was in. Finally, *Boyce* provides a purely objective element, as the election to kill must have been such as a reasonable person would have made. This element, by incorporating the reasonable person standard, allows the jury to reflect on whether, even given the subjective beliefs of the defendant, a reasonable person would have made the election to kill.

As the trial court correctly stated the law under *Boyce*, we find no error in the trial court's self-defense instruction.

b. *Instruction on duty to retreat.*

■ The trial court instructed the jury on the duty to retreat as follows:

> The legal excuse of self-defense is available only to those who act honestly and in good faith. This includes the duty to retreat or avoid the danger if reasonably possible.

This instruction is identical to CRIM. JIG 7.08.

JoAnn claims that there is no duty to retreat in her own home. She cites the committee comment to Minn.Stat. § 609.065, which states that

> [b]eing in a dwelling goes only to the question of his duty to leave it before attempting to kill. Case law is to the effect that he need not so retreat. [*See*

*State v. Touri,* 101 Minn. 370, 112 N.W. 422 (Minn.1907).]

Minnesota has retreated from this free-wheeling concept of self-defense. *See State v. Sanders,* 376 N.W.2d 196, 200–01 (Minn.1985) (jury instruction on self-defense patterned on CRIM. JIG 7.08 upheld in case where defendant killed victim in own home); *State v. Morrison,* 351 N.W.2d 359, 362 (Minn.1984) (same). The trial court did not err in its instruction on the duty to retreat. Additionally, the defense did not object to this instruction, so they have waived the issue on appeal. *State v. Austin,* 332 N.W.2d 21, 25 (Minn.1983).

c. *Use of word "then" to modify "necessary".*

■ The trial court's charge stated that the lethal act "must have been done in the belief that it was *then necessary* in order to avert death or great bodily harm to the defendant or another." (Emphasis added.) The CRIM. JIG only states that the act must be *necessary,* not *then necessary,* in order to avert death or great bodily harm. Appellant suggests this adds an additional element of immediacy to the requirements of self-defense, an element not warranted by case law or statute.

We fail to see where the addition of the word "then" provides an additional element of immediacy to the requirements of self-defense. Appellant also did not object to this instruction, so she has failed to preserve the issue for appeal. *Id.*

d. *Use of pronoun "he".*

■ JoAnn disputes the use of the word "he" when the jury instructions speak of the reasonable person. The state concedes that use of this pronoun was an inadvertent mistake. We agree; the reasonable person instruction should be gender neutral, so that the jury might not be misled

into believing that the reasonable person is a male. *Cf.* 1986 Minn. Laws ch. 444, § 1 (providing for gender neutral statutory language); *see also State v. Wanrow,* 88 Wash.2d 221, 240, 559 P.2d 548, 558 (1977) ("[t]hrough * * * the use of the masculine gender [the instruction] leaves the jury with the impression the objective standard to be applied is that applicable to an altercation between two men."). This small inadvertent error, however, does not seem to be prejudicial; in any event, no objection was made to the instruction.

2. The trial court compelled the defendant to undergo an adverse psychological examination as a condition of allowing her expert to testify regarding battered women's syndrome. On appeal, the state puts forth two separate theories for compelling the defendant, prior to testifying, to answer questions posed to her by the state.

a. *Minnesota Rules of Criminal Procedure.*

■ Minnesota Rules of Criminal Procedure, Rule 20.02 provides authority for a court to "order a mental examination of the defendant when the defense has notified the prosecuting attorney * * * of an intention to assert a defense of mental illness or deficiency[.]"

The defendant in this case, however, did not assert the defense of mental illness or mental deficiency. The defendant asserted that her actions were justified on the grounds of self-defense. Self-defense is not mentioned in the rule as a situation where the state may compel a defendant to undergo an adverse mental examination. This rule of criminal procedure does not provide a basis for the examination of the defendant.[2]

b. *Inherent authority of the Court.*

■ The state also argues that the trial court's order, which was for the stated

---

**2.** The state contends that the defense offered by the defendant in this case is, in reality, a diminished capacity defense. Such a defense was specifically rejected by our supreme court in *State v. Bouwman,* 328 N.W.2d 703 (Minn.1982). Appellant's arguments, however, do not go to any diminished capacity on the part of the defendant. There was no allegation, and there

was no proof presented to the trial court, that the defendant lacked the capacity to commit this crime. The expert testimony that was admitted was admitted solely for the purpose of explaining the reasonableness of the defendant's actions; appellant's expert and the state's expert disagreed on their conclusion regarding this point, which was the central issue at trial.

purpose of giving the state "a fair opportunity to rebut" appellant's expected offer of expert testimony on battered women's syndrome, was an order falling within the trial court's inherent discretion in conducting a fair trial.

The state notes that "the determination of what constitutes proper rebuttal evidence rests almost wholly in the discretion of the trial court." *State v. Eling,* 355 N.W.2d 286, 291 (Minn.1984). In this case, however, we are not merely faced with the question of whether the trial court could allow rebuttal testimony on the issue of battered women's syndrome and its applicability to the standards of self-defense in *Boyce.* Defendant does not argue that the state had no right to present evidence (in the form of expert testimony) to rebut her claim. Defendant does contend, however, that in gathering its evidence on battered women's syndrome, the state has no right to compel her examination. Such a compelled examination is a procedure with constitutional implications regarding compelled testimony. *See State v. Olson,* 274 Minn. 225, 143 N.W.2d 69 (1966).

In *Olson,* the supreme court was asked to prohibit the compelled psychological examination of a defendant pleading not guilty by reason of insanity. At the time, there was no rule authorizing such an examination. The supreme court declined to rule that it was "within the inherent powers of the district court to order a psychiatric examination to determine criminal responsibility where the statutes of this state are silent as to any procedure concerning it," and granted the writ. *Id.* at 226, 143 N.W.2d at 71. The court noted that:

> substantial questions as to the nature and scope of such an examination would be best solved by a legislative enactment setting down certain guidelines rather than by courts on an ad hoc basis.

*Id.* at 231, 143 N.W.2d at 73–74. The court concluded that:

> since there are no statutes in this state governing the procedure in cases where the accused pleads insanity as a defense and providing the necessary machinery and guidelines for the protection of the accused from self-incrimination, *the courts have no legal basis * * * for* ordering an examination.

*Id.* at 233, 143 N.W.2d at 75.

In this case, there is no rule of criminal procedure allowing the compelled adverse examination of a defendant for purposes of determining whether she acted in self-defense. The trial court, in an apparent attempt to address the constitutional problems in compelling a defendant to answer questions posed by a state-appointed expert, seems to have instructed the parties that the examination of the defendant was not to include questions regarding the acts for which JoAnn was on trial. The court did not, however, place any restrictions on the record; there was no order which would indicate the trial court provided the types of protection necessary under rule 20.02.

Under rule 20.02, the defendant is afforded significant protections when forced to undergo an examination by the state. Subdivision 2 provides that the court shall appoint the mental examiner; in this case, the state was allowed to choose the examiner. More importantly, subdivision 6 limits the admissibility of statements made by the defendant in the course of the examination; the statements are not admissible in the portion of the trial determining the guilt of the accused. In this case, the state initially sought to question their expert about what the defendant told her about the events leading up to and including the acts for which defendant was on trial. The trial court sustained an objection to this questioning; shortly thereafter, however, the state elicited testimony from the expert that the defendant had not told the expert that she was afraid, either for herself or her grandson, on the night in question. The question and its answer clearly violated appellant's constitutional right to be free from compelled examination by the state; it also is an improper comment on the defendant's right to remain silent. As was noted in an early Minnesota case:

> The constitutional guaranty [against self incrimination] not only protects a person from being compelled to give direct evi-

dence tending to establish his guilt, but also from giving any circumstance or link in the chain of evidence which may tend to convict him of a crime.

*State v. Gardiner*, 88 Minn. 130, 139, 92 N.W. 529, 533 (1902). The prosecutor's questioning implied that the defendant was not afraid (either for her own or for her grandson's welfare) on the night in question. This is clearly an impermissible unconstitutional inference based on appellant's refusal to discuss the issue with the state's appointed expert.[3]

A conviction may stand, despite violation of a defendant's constitutional rights, only if the admission of the evidence was harmless beyond a reasonable doubt. *State v. Robinson*, 427 N.W.2d 217, 224 (Minn. 1988). When an accused's constitutional rights have been violated, an appellate court must independently evaluate the evidence to determine whether or not the average jury would have changed its verdict had the unconstitutional material been excluded. *Id.* In employing the harmless error doctrine, the error should be considered in the broader context of all the facts appearing in the record. *Id.* at 224.

In this case, the constitutionally impermissible material directly undermined ap-

pellant's only defense; she had essentially admitted to the acts constituting felony murder, so self-defense was the only way to escape culpability for the act. The prosecution correctly noted that a key to this case was the credibility of JoAnn Hennum; undermining her credibility in an unconstitutional manner is a serious mistake in the context of this trial.

Coupled with this error are the facts that the court had no authority to order an adverse mental examination, and the examination ordered contained no limitations on the evidence and diagnoses which would eventually be admissible.[4] Much of the rest of JoAnn's testimony was not only credible, it was corroborated by other sources. The attack on her credibility brought about by the improper questioning and the improper adverse mental examination directly undermined appellant's claim of self-defense. Credibility was a critical issue in this case; in order for appellant's self-defense claim to succeed, the jury had to believe that the assault she committed was a necessary response to her husband's attacks on her. Appellant testified to facts indicating that it was; Jada testified that the time period between Robert Hennum's

---

3. The state argues that, even if the compelled examination of the defendant and the comment on her refusal to discuss the events in question were in error, this error was not prejudicial because the trial court ruled, in its post-trial memorandum, that it should not have allowed the self-defense claim to go to the jury. Under this reasoning, as the defendant had no right to a self-defense instruction, any error surrounding her defense was not reversible error. *See State v. Columbus*, 258 N.W.2d 122, 125 (Minn. 1977) (conviction affirmed although trial court erroneously instructed jury that defendant had burden of proof on self-defense issue, as defense not available as a matter of law under circumstances of case). If the trial court was correct in its post-trial dictum, however, we believe its earlier erroneous rulings have denied appellant of her right to a fair trial. *See State v. Reardon*, 245 Minn. 509, 513–14, 73 N.W.2d 192, 195 (1955) (due process, as guaranteed by the Minnesota and Federal Constitutions, includes the right of a person to be tried according to the law and evidence in the case). Appellant was told she would be allowed a jury instruction on self-defense; this led to her testifying (essentially admitting the elements of the crime), to her compelled adverse examination (and the result-

ing diagnosis, all of which undermined her claim of self-defense), the damaging *Spreigl* evidence, and the constitutionally objectionable questioning. The trial court, through its ruling, is saying that all of this information is irrelevant. If it is, we believe the potential for confusion of the jury regarding the legal and factual issues it was to decide turned this into a fundamentally unfair trial.

4. Over objection, the state's expert was allowed to make several diagnoses which were inconsistent with battered women's syndrome; these conclusions were particularly damaging to defendant's case, as they suggested that she was a person who merely did not take responsibility for her actions, rather than someone who was forced by circumstances to strike back against her attacker. At trial and on appeal, appellant contends that the adverse medical examiner's opinion should have been limited to a determination of whether she was suffering from battered women's syndrome. As in *Olson*, we are "convinced that substantial questions as to the nature and scope of such an examination would best be solved by a legislative enactment setting down certain guidelines." *Olson*, 274 Minn. at 231, 143 N.W.2d at 73.

attacks and appellant's response was much longer than appellant indicated. Excluding the constitutionally impermissible material undermining appellant's credibility and the broad-based psychological attack spearheaded by the illegal compelled examination conducted by the state, we believe that the average jury might have changed its verdict in this case.

■ Thus, it appears that the erroneous order requiring the defendant to submit to an adverse psychological examination was brought on by the trial court's admission of expert testimony as to the "battered women's syndrome," and its desire to give the state the opportunity to rebut that testimony. We think it was also error for the court to admit evidence as to the "battered women's syndrome." In *State v. Saldana,* 324 N.W.2d 227 (Minn.1982), our supreme court held that it was error for the trial court to admit expert testimony as to the "rape trauma syndrome" in a rape case. It is true that the testimony was used against the defendant in *Saldana,* while it was intended in this case to aid the defendant, but the basic principle enunciated by the supreme court in *Saldana* remains the same:

> To be admissible, expert testimony must be helpful to the jury in reaching its decision:
>
> > "The basic requirement of Rule 702 is the helpfulness requirement. If the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience, then the testimony does not meet the helpfulness test. (Citation omitted)."
>
> If the jury is in as good a position to reach a decision as the expert, expert testimony would be of little assistance to the jury and should not be admitted.

*Id.* at 229.

In our opinion, the jury in this case was equally as capable as the expert of determining whether or not the defendant acted in self-defense.

■ 3. The decision to admit evidence of prior related misconduct is a matter for the trial court's discretion. *State v. Spreigl,* 272 Minn. 488, 496, 139 N.W.2d 167, 172 (1965). In determining whether such evidence is admissible, the trial court is to determine whether the probative value of the evidence is outweighed by its potential prejudicial effect on the jury. *Id.*

There certainly was a potential for prejudicial effect in the use of JoAnn's prior bad acts at the trial. The prior acts allowed into the record were generally incidents relating to prior violent acts of JoAnn against Robert, and one involved threats with a gun. However, JoAnn's expert had not been told by JoAnn of the specific prior bad acts the trial court allowed in; the expert indicated that such incidents would affect her determination regarding whether JoAnn suffered from battered women's syndrome. The incidents seem quite significant in assisting the jury to determine whether JoAnn's expert was able to conduct a thorough evaluation. While this is a close question, the trial court did not abuse its discretion in allowing this evidence into the record.

■ 4. JoAnn did not request an instruction on the lesser included offense of first degree manslaughter (heat of passion). Failure to request such an instruction, or object to its omission, constitutes a waiver on appeal. *State v. Morales,* 324 N.W.2d 374, 376 (Minn.1982); Minn.R.Crim. P. 26.03, subd. 18(3).

Even if appellant had requested such an instruction, the trial court was not compelled to give it. In determining what, if any, lesser degrees should be submitted, the test is whether the evidence would reasonably support a conviction of the lesser degree while, at the same time, a finding of not guilty of the greater offense would be justified. *State v. Leinweber,* 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975). The proposed instruction contains an element of intent; JoAnn denied having an intent to kill Robert, and the jury did not convict her of Count I, intentional killing. In a similar case, the supreme court held

such an inconsistency supports denial of a proposed manslaughter instruction. *See State v. Hoffman,* 328 N.W.2d 709, 718 (Minn.1982) (jury found premeditation; therefore, crime not committed in heat of passion).

JoAnn's claim that she should have received a manslaughter instruction is based on an "imperfect self-defense" theory. Under this theory, the offense of intentional murder is reduced to some degree of manslaughter when the actor's subjective belief that self-defense was necessary is unreasonable (and therefore negligent). As the required intent would therefore be missing, the homicide would be a negligent or reckless one. *See* W. LaFave & A. Scott, *Criminal Law* 463 (1986).

Minnesota has not adopted the imperfect self-defense theory. A similar theory, that of diminished capacity, has been rejected. *See State v. Bouwman,* 328 N.W.2d 703, 706 (Minn.1982) (distinguishing intent as a fact issue from the question of the mental capacity of a defendant to commit a crime). We decline to adopt this theory; such a step appears to be more properly a matter for our supreme court or our legislature.

Since there is to be a new trial, appellant's other contentions regarding trial court error are moot.

## DECISION

There was no basis in law for the trial court's order compelling the adverse mental examination of the defendant. The error, when viewed in light of the other errors and the entire record in this case, was not harmless beyond a reasonable doubt.

Reversed and remanded for a new trial.