STATE of Minnesota, Respondent,

v.

Timothy Michael ERICKSON,
Appellant.

No. C8–88–2659.

Supreme Court of Minnesota.

Dec. 22, 1989.

Steven P. Russett, Asst. State Public Defender, St. Paul, for appellant.

John E. MacGibbon, Sherburne County Atty., Thomas N. Price, Asst. Sherburne County Atty., Elk River, and Hubert H. Humphrey, III, State Atty. Gen., St. Paul, for respondent.

COYNE, Justice.

Defendant Timothy Michael Erickson was convicted of first degree murder, Minn.Stat. § 609.185 (1988), and sentenced to life imprisonment. On appeal from his conviction for the murder notoriously known as "the vampire murder of St. Cloud," defendant contends that (1) he

proved he was so intoxicated that he could not form the requisite statutory intent or premeditation; (2) he proved by a preponderance of the evidence that mental illness had rendered him incapable of knowing the nature of his act or its wrongfulness; and (3) the trial court erroneously admitted his confession, which was coerced and taken in violation of his right to counsel. We affirm the conviction.

Defendant, then 18 years of age, and his 19-year-old brother, Mark, shared an apartment. From time to time the brothers sheltered homeless or runaway teenagers, and in March 1988, four other teenagers between the ages of 15 and 17 years, two of them girls, were staying there. Sometime around March 15, defendant, Mark, the resident teenagers, Bill Benedict, and three other 15-year-old boys, talked about forming a vampire cult. Apparently, defendant became fascinated with the subject after watching a movie about teenage vampires, and he began asking Benedict about the occult. Most of the witnesses said they thought then that defendant was merely joking about forming a vampire cult.

On March 21, 1988, seven of the young men, including both Erickson brothers and Donald Gall, the victim, decided to go camping in Riverside Park near St. Cloud. At about 11:30 that evening, Gall arrived at the Erickson apartment "sloppy drunk"; before they left for their outing he also smoked marijuana. As the group prepared to leave, Benedict became uneasy and left the party. About 1:00 a.m. the remaining six set off for the campsite. Defendant brought a case of beer, some marijuana, and Aphedrin, an over-the-counter stimulant; one of the group brought hot dogs; a 15-year-old brought defendant's fixed-blade hunting knife and was heard to mention to defendant something about the "first victim."

For a couple of hours the group sat around their campfire near the edge of the frozen river and drank beer, smoked marijuana, ate hot dogs, and talked about women, hunting, drugs, jail and motorcycles. At about 4:30 a.m., one of the men left because he was cold and tired, and Gall lay down near the fire. After Gall fell asleep, the four remaining campers went into the woods where defendant suggested that they kill Gall and drink his blood. He told the others that they could wake Gall and defendant would kill him with the knife that the 15-year-old had brought. Mark Erickson refused to participate in the plan.

As the group returned to the campfire, defendant pulled his knife from its sheath and approached Gall. Gall suddenly awoke. Defendant told Gall they would keep the fire going and that he should go back to sleep. The group returned to the woods to revise their plan. This time the defendant told the others that he would club Gall while he slept and that the others should kick him. Defendant's brother again refused to participate in the plan to murder.

The group returned to the campfire, and defendant clubbed Gall over the head with a tree branch; then while the other two kicked Gall, defendant continued to beat him with the tree branch. After Gall lost consciousness, defendant took his knife from the 15-year-old, pulled Gall's head into the air, and slit his throat. Gall bled to death. Defendant and his two accomplices then licked Gall's blood from their hands. Next they removed Gall's leather jacket and his wristwatch, lifted his wallet, and emptied his pockets. When the defendant announced, "We've got to get rid of the body," the three assailants pushed Gall's body off the river ice into open water.

As the sun rose the group cleaned the campsite. Defendant put his log club into the campfire. Taking a different route home to avoid detection, the group stopped at a convenience store to buy cigarettes with money taken from Gall.

Following the return home, defendant told both of the girls who were staying with the Erickson brothers that he had killed Gall by beating him with a log and stabbing him with a knife and that he had thrown Gall's body into the river. Defendant bragged that he had drunk Gall's blood and licked the blood from his hands.

Gall's blood-soaked jacket and the other items taken from Gall were exhibited as proof of the crime.

That morning Mark Erickson described the killing to Benedict and that evening defendant told Benedict about the murder, saying that Gall's death was "not really that big of a deal." At about 4:00 a.m. on March 24, 1988, a drunken Benedict wandered into the St. Cloud Law Enforcement Center and reported the murder. Gall's body was soon discovered floating in the river a short distance downstream from the campsite, and shortly thereafter defendant was arrested at the St. Cloud bus terminal. Defendant was taken to the interrogation room at the law enforcement center where he was advised of his *Miranda* rights. Defendant initially denied any involvement in the murder, but after tests showed the presence of blood on his jacket and boots, defendant began to cry and confessed to the murder. The initial confession was not recorded, but defendant immediately repeated his confession to a police stenographer.

The trial was bifurcated. Defendant's defense in the first phase of the trial was that voluntary intoxication had rendered him incapable of forming an intention to murder. The jury found defendant guilty of murder in the first degree. In the second phase of the trial, defendant contended that mental illness had rendered him incapable of knowing the nature of his act or that it was wrong. The jury reaffirmed the guilty verdict.

■ On appeal defendant first contends that he met his burden of proving by a preponderance of the evidence that he was so intoxicated when Gall was killed that he was rendered incapable of forming either the intent to kill or the premeditation necessary to the crime of first degree murder.[1] There was evidence of defendant's history of chemical abuse, that he had consumed a great deal of beer and Aphedrin and had smoked marijuana during the day and night before he killed Gall, together with evidence that his high tolerance of drugs and alcohol allows him to "mask" the physiological effects of these chemicals and to appear normal to others, which would have permitted the jury to conclude that he was unable to intend or premeditate murder. However, two witnesses, one of whom—his brother—had previously observed defendant in a state of extreme intoxication, testified that defendant appeared sober during and immediately after the murder. Moreover, there was other evidence of deliberation: defendant formulated a plan of murder and then a revised plan; there were two brief cessations in the assault when Gall fell unconscious; the attackers dragged Gall from the river's edge back to the campfire and propped him against a tree before defendant purposefully slit his throat; and it was defendant's decision to clean up the murder site and to take an alternate route home to avoid detection. Surely, "the record contains sufficient evidence to support the conclusion reached by the [trier of fact] * * * despite the existence of some evidence to the contrary." *State v. Wahlberg*, 296 N.W.2d 408, 416 (Minn.1980) (voluntary intoxication). Taking the evidence in the light most favorable to the state and assuming that the jury believed the state's witnesses and disbelieved everything which contradicted their testimony, we must conclude that the jury could reasonably find defendant guilty of first degree murder. *Wahlberg*, 296 N.W.2d at 411.

■ Similarly, defendant asserts that the jury was required to excuse him from criminal responsibility because of the evidence of his fascination with the occult and the testimony of his expert witness, a licensed

---

1. Minn.Stat. § 609.075 (1988) provides as follows:

**609.075 INTOXICATION AS DEFENSE.** An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind.

The defendant has the burden of proving voluntary intoxication by a fair preponderance of the evidence, but, of course, the state has the ultimate burden of proving beyond a reasonable doubt that the defendant had the required intent.

psychologist who gave as his opinion that the defendant was suffering from an organic personality syndrome which could have been caused by defendant's chemical abuse and that as a result defendant did not know the wrongfulness of his acts when he killed Gall. There was, however, testimony from a psychologist and a psychiatrist who observed defendant and evaluated his condition during his 60–day stay at the Minnesota State Security Hospital. It was their conclusion that defendant exhibited some antisocial behavior but that he did not suffer from any mental illness and knew the wrongfulness of his act when he murdered Gall.

The defendant argues that the evidence of his delusional thoughts about the occult and vampires somehow undercuts the opinion testimony that he was not mentally ill within the meaning of Minn.Stat. § 611.026 (1988).[2] The ultimate inquiry, of course, is not whether the defendant is psychotic or has an antisocial personality but is, instead, whether defendant has proved by a preponderance of the evidence that because of mental illness or mental deficiency he did not know the nature of his act or that it was wrong. *State v. Malley*, 285 N.W.2d 469, 472 n. 3 (Minn.1979). Viewing the evidence as a whole in the light most favorable to the state, we conclude that the jury could properly reject defendant's mental illness defense and find defendant guilty of first degree murder.

■ Defendant also contends that it was reversible error for the trial court to admit defendant's 14–page custodial confession, which defendant claims was not only coerced but was obtained in violation of his right to counsel. It is defendant's position that three circumstances, taken together, amount to coercion: (a) he was only 18 years old with almost no previous contact with the criminal system when he was arrested; (b) he has a history of psychologi-

cal problems; and (c) he is addicted to chemicals and the detectives left his half-emptied bottle of wine on the table before him during the interrogation.

A coerced confession is, of course, inadmissible, e.g., *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and it is for the prosecution to prove that the confession was made voluntarily. On review, we will not reverse any findings of fact unless they are clearly erroneous, but we do make an independent determination of voluntariness on the facts as found. *State v. Hardimon*, 310 N.W.2d 564, 567 (Minn.1981).

Standing alone, that defendant was young and had previously had psychological problems provide no indication that defendant was coerced into confessing involuntarily. Although defendant was new to the criminal justice system, the police advised him of his constitutional rights as enunciated in *Miranda* before the interrogation began and again before his confession was recorded by the stenographer. In addition, they gave him written advisement of his *Miranda* rights. Nor does the fact that the police left the contents of defendant's pockets, including Gall's wristwatch and an opened bottle of wine, in the interrogation room suggest psychological torture resulting in an involuntary confession. After considering all of the relevant factors individually and in the aggregate, we conclude that defendant's confession was voluntary.

■ Defendant also contends that his confession was obtained in violation of his sixth amendment right to counsel. Subsequent to the interrogation and confession in this case, we held that when a suspect who is in custody "arguably" invokes the right to counsel, all questioning by the police must cease except to "clarify the earlier comment and to ascertain the ac-

---

**2.** Minn.Stat. § 611.026 (1988) provides:

**611.026 CRIMINAL RESPONSIBILITY OF MENTALLY ILL OR DEFICIENT.** No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense; but the person shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act the person was laboring under such a defect of reason, from one of these causes, as not to know the nature of the act, or that it was wrong.

cused's true desires respecting the aid of counsel." *State v. Robinson*, 427 N.W.2d 217, 223 (Minn.1988); *see also* Comment, *The Right to Counsel During Custodial Interrogation: Equivocal References to an Attorney—Determining What Statements or Conduct Should Constitute an Accused's Invocation of the Right to Counsel*, 39 Vand.L.Rev. 1159, 1181–86 (1986). This approach requires law enforcement officers to seek a clear enunciation from the accused about the decision to have counsel present during interrogation.

The following colloquy between an officer and defendant occurred at the beginning of the recorded statement:

Q. Have you been advised that you have the right to remain silent?

A. Um-hum.

Q. Have you been advised that you have the right to talk to a lawyer and to have him present, at this time, and at any other time, you are being questioned?

A. Ya.

Q. Have you been advised that if you cannot afford a lawyer and want one, a lawyer will be provided for you?

A. Ya.

Q. Do you understand all of these rights?

A. Ya.

Q. Having these rights in mind, are you willing to give me a statement at this time?

A. Ya.

Q. Tim we've been talking to you since about 12:35 this afternoon about an incident that occurred earlier in the week. At that time I read the Warning and Statement of Rights to you and you signed it and agreed to talk with us. In our subsequent conversation we discussed a homicide which you admitted to your involvement. At this time we would like to take a written statement from you, going over what we've already gone over verbally and I would like to ask you the same questions and your answers again and put it on paper. Are you willing to do that?

A. Ya.

Q. Do you want a lawyer here at this time before you do that?

A. Not much he can do.[3]

After this last question, the officers immediately began questioning defendant about the murder.[4]

Defendant argues that his answer to the question about representation is, at least arguably, an indication that he did not understand his right to counsel pursuant to *Miranda* or the usefulness or reason for obtaining advice from an attorney. It seems to us that a reasonable police officer, particularly an officer who did not have the benefit of our ruling in *Robinson*, could well have understood defendant's response to constitute an unequivocal waiver of the right to counsel during interrogation.

We do not believe, however, that a new trial is required even if the confession was admitted improperly. The evidence overwhelmingly points to defendant's guilt of first degree murder. The jury heard testimony from two eyewitnesses to the murder, heard testimony of at least three people to whom defendant confessed before he was arrested, and had physical evidence linking defendant to the murder scene. Under all the circumstances, if admission

---

**3.** Originally, the answer was transcribed to read, "Not much you can do." Defendant, however, when reviewing the transcribed statement, crossed out "you" and wrote in "he."

**4.** We also note that the police officers testified at the omnibus hearing that defendant waived his right to counsel before giving the 90-minute unrecorded "prestatement conversation." Defendant did not testify at the hearing, and thus the officers' testimony about the waiver of counsel before this unrecorded statement was not rebutted.

Although the officers did not have the assistance of our opinion in *State v. Robinson*, 427 N.W.2d 217, 224 n. 5 (Minn.1988), which was decided after the interrogation occurred, we again encourage police interrogators to record all conversations with the accused regarding the accused's constitutional rights as provided in *Miranda*. By recording these conversations, the police interrogators will preserve the integrity of the interrogation as well as ensure that the constitutional rights of the accused are not violated.

of defendant's confession could be characterized as violative of his right to counsel, it was harmless error beyond a reasonable doubt. *E.g., Robinson*, 427 N.W.2d at 224.

Affirmed.