STATE of Minnesota, Respondent,

v.

Michael DOUGLAS, Appellant.

No. C9–92–1458.

Court of Appeals of Minnesota.

June 22, 1993.

Review Denied Aug. 16, 1993.

1. A priority of coverage issue lurks within these facts, but was not raised.

Hubert H. Humphrey, III, Atty. Gen., Norman B. Coleman, Jr., Asst. Atty. Gen., St. Paul, Ross Arneson, Blue Earth County Atty., Mankato, for respondent.

Susan Andrews, Asst. Public Defender, St. Paul, for appellant.

Considered and decided by RANDALL, P.J., and SHORT and AMUNDSON, JJ.

## OPINION

RANDALL, Judge.

Appellant Michael F. Douglas was convicted of second degree felony murder, first degree assault, second degree assault, false imprisonment, aggravated robbery, theft, and burglary. Appellant was sentenced to 330 months, a double upward durational departure. Appellant challenges his convictions and his sentence. We affirm.

## FACTS

Appellant, having known the victim for many years, suggested to an acquaintance, Dustin Bodin, that they steal the victim's car and Bodin agreed. On the morning of April 22, 1991, they waited for the victim to leave his trailer home, but became restless and entered the trailer in search of food, money, and the keys to the car. Appellant was carrying a hammer he had found in the trailer park and Bodin was carrying a BB gun. Appellant went into the bedroom where the victim was sleeping and grabbed the car keys.

The victim awoke as appellant was leaving the room. He was told to lie on the bed. A blanket was tossed over his head, and his hands and ankles were bound with electrical cords taken from nearby appliances. Bodin hit him on the head with the BB gun to subdue him. As the victim struggled to free himself, appellant struck him on the head repeatedly with the hammer. The victim was apparently still alive when they left. Appellant and Bodin attempted to steal the car but were unable to start it, so they left on foot. Appellant discarded the hammer in a dumpster. The victim was dead by the time his body was discovered by a neighbor. An autopsy showed that he died from a combination of factors, including head trauma, skull fractures, blood loss, and lack of oxygen.

At the crime scene, investigators noticed that appellant's and his brother's phone number had been scratched off the victim's telephone list. Several officers recalled that appellant had allegedly stolen some property from the victim in the past, so they decided appellant should be located for questioning. A neighbor told police that she saw two males, one matching appellant's description, near the victim's trailer around the time of the homicide. Another neighbor informed police that appellant hated the victim and wanted to kill him because the victim had allegedly molested appellant's brother.

That night, appellant and Bodin found a car with keys in the ignition and drove away in it. They were stopped by Officer Melissa Meyer for a traffic violation. Appellant gave his name and falsely stated that he lived on Terri Lane, the street where the victim resided. The officer noticed a BB gun between Bodin's feet. She arrested appellant and Bodin for driving a stolen vehicle and took them to the police station for questioning.

Mankato Public Safety Director Glenn Gabriel and Commander Michael Hoffman interviewed appellant. Hoffman read appellant his *Miranda* rights and questioned him generally about his movements over the last few days. Appellant initially denied any involvement in the homicide. The officers asked him several times whether his brother had been with him, which appellant emphatically denied.

Director Gabriel then talked to appellant alone, in a short unrecorded three to five minute conversation. Gabriel told appellant that he did not believe appellant was telling the whole truth, and that he was seen at the trailer park with another man. He pressed appellant to tell him whether his brother was with him, telling him that "it would be in his best interests, as well as the interests of his brother" if he talked. Appellant adamantly denied that his brother was involved or had been near the trailer park. Gabriel continued to press appellant about the brother's involvement. Appellant then admitted his involvement in the homicide, but stated that his brother had not been with him, Bodin had, and that they had not meant to kill the victim.

Appellant agreed to give a formal statement. Commander Hoffman conducted a formal, recorded interview, and read appellant his *Miranda* rights a second time for the record. Appellant described the events of the last two days in detail. He admitted to hitting the victim with a hammer three or four times because he tried to get loose. Appellant told the officers that the victim used to babysit him and his brother, and that he used to like him until hearing recently that he had molested appellant's brother. Appellant admitted to having stolen the victim's car once before and told the officers where he had discarded the hammer. At the end of the recorded statement, appellant stated that he had made the statement voluntarily, without any threats, promises, or offers of rewards.

At the omnibus hearing, appellant claimed his statement was coerced, and sought to have it suppressed. Appellant's counsel claimed that Director Gabriel threatened to involve appellant's brother in the incident unless appellant confessed, knowing that appellant would probably confess in order to protect him. Director Gabriel denied threatening to charge appellant's brother during his private interview with appellant. He admitted knowing that appellant was protective of his brother. Gabriel testified:

I * * * asked Mr. Douglas if he wouldn't be honest with us and tell us the full story as opposed to the half story that he had told us. We felt it would be in his best interests as well as the interests of his brother * * *. And that he then again categorically denied [his brother] had been involved in any fashion or had been in the trailer park. And I said how can I believe you that [he] wasn't with you when we believe you were there. And to do that at which time he explained that [his brother] had not been with him, that Bodin had been with him and they didn't mean to kill [the victim].

The trial court denied appellant's suppression motion and the statement was admitted at trial. The jury convicted appellant on multiple charges, including second degree felony murder. Appellant was sentenced to 330 months, a double upward durational departure. Bodin, who had pleaded guilty, was sentenced to 165 months.

## ISSUES

1. Did the trial court err by holding that appellant's statement was voluntary and thus admissible at trial?

2. Did the trial court err by sentencing appellant to 330 months, a double upward durational departure?

## ANALYSIS

### I.

*Coercion*

■ Appellant argues that his confession was the result of impermissible coercion during the private, unrecorded interview with Gabriel. On review, this court will not reverse any findings of fact unless they are clearly erroneous, but will make

an independent determination of voluntariness of a confession on the facts as found. *State v. Erickson*, 449 N.W.2d 707, 710 (Minn.1989).

The due process clause of the Fourteenth Amendment of the United States Constitution prohibits admission of confessions unless they are voluntary. *Haynes v. Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *State v. Jensen*, 349 N.W.2d 317, 319 (Minn.App.1984). Whether a confession is voluntary depends upon the totality of the circumstances. *State v. Slowinski*, 450 N.W.2d 107, 111 (Minn.1990). The test is whether police actions,

> together with other circumstances surrounding the interrogation, were so coercive, so manipulative, so overpowering that [the defendant] was deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did.

*State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991). Relevant factors include the defendant's

> age, maturity, intelligence, education, experience and ability to comprehend; the lack of or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; and whether the defendant was deprived of any physical needs or denied access to friends.

*Id.* The court examines the effect of the totality of the circumstances upon the defendant's will and whether his will was overborne by the circumstances. *Id.*

Appellant assumes that the state's implied threat to involve his brother if he did not cooperate renders appellant's confession coerced and inadmissible. Appellant cites *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), where a defendant's confession was obtained by police after they threatened to bring in the defendant's wife for questioning. However, *Rogers* was reversed because the lower courts had used an incorrect standard in reviewing the admission of the defendant's confession, taking into account the probable truth or falsity of the confession instead of focusing on whether the conduct of the law enforcement officials had overborne the defendant's will. *Id.* at 543–44, 81 S.Ct. at 741. The Court did not determine whether the confession was actually coerced.

▮ Familial coercion may be a consideration in determining whether a confession was coerced. *See United States v. Cammisano*, 599 F.2d 851, 856 (8th Cir.1979); *see also State v. Anderson*, 298 N.W.2d 63, 65 (Minn.1980) (promise to free a relative in exchange for a confession may render a confession involuntary). However, it is only one consideration. This court must consider the totality of the circumstances surrounding the confession.

In *Rogers*, there was no indication that the police had any reason to believe the wife was involved in an alleged robbery. In this case, while the police did not have any direct evidence that appellant's brother was involved in the homicide, early in the investigation both appellant and his brother were discussed as people the police would likely talk to about the crime.

Gabriel testified at the omnibus hearing regarding early suspects:

> Included in that were a Mr. Douglas and his brother * * * who were acquaintances of the victim and in fact had been involved in previous criminal activity involving [the victim]. There was evidence at the scene noting Mr. Douglas and [his brother's] phone number which had been scratched off of a phone listing next to the phone. And during the process of conducting the investigation we were using that phone list to develop leads and information with regards to [the victim] and any other persons who might be knowledgeable of [the victim].

He also testified that they knew the brother had been a suspect in a previous car theft involving the victim. In addition, the police knew that two males had been seen in the area of the crime, but they did not know if appellant was with his brother or Bodin. The police officers had some basis on which to believe the brother was a suspect or should at least be questioned about the crime.

Appellant's recorded statements reflect that he fully understood that he was the prime suspect in a homicide investigation and that his situation was serious. Appellant has prior experience with police interrogations through the juvenile justice system. He had only been in custody approximately three hours before the recorded statement was given. In addition, he was read his *Miranda* rights at least twice and offered no indication that his waiver of those rights was anything but voluntary during the recorded interview. Finally, appellant concluded his confession by agreeing that he made the statement without any threats, promises, or offers of reward. The totality of the circumstances indicate that Gabriel's questioning of appellant was not sufficient to have overborne appellant's will and to render the confession inadmissible as coerced.

Appellant also argues that because the police failed to record critical parts of the interrogation, the state has failed to prove voluntariness by a preponderance of the evidence. The Minnesota Supreme Court has encouraged the police to record all conversations with the accused relative to the accused's constitutional rights, including preliminary matters. *Pilcher*, 472 N.W.2d at 333; *Erickson*, 449 N.W.2d at 711 n. 4; *see also State v. Robinson*, 427 N.W.2d 217, 224 n. 5 (Minn. 1988).

In *Pilcher*, the court stated:

In the future, we urge that law enforcement professionals use those technological means at their disposal to fully preserve those conversations and events preceding the actual interrogation. Law enforcement personnel and prosecutors may expect that this court will look with great disfavor upon any further refusal to heed these admonitions.

*Pilcher*, 472 N.W.2d at 333. We note the Mankato police did not have the benefit of the supreme court ruling in *Pilcher* at the time of the interrogation. However, the deliberate use of unrecorded conversations to obtain information prior to going on record is a red flag. The question here is close, and we have only Gabriel's testimony to support the state's position that there was no coercion. On the totality of the facts, although we do not approve of the unrecorded interview, we do not find reversible error in admitting appellant's confession.

## II.

### Sentencing departure

Appellant was sentenced to 330 months imprisonment for his conviction of second degree felony murder, a double upward durational departure from the presumptive sentence of 165 months. The sentencing court has discretion to depart from the sentencing guidelines only if substantial and compelling circumstances are present. *State v. Best*, 449 N.W.2d 426, 427 (Minn.1989).

The trial court based its upward departure on the invasion of the victim's zone of privacy, particular cruelty, and particular vulnerability of the victim. There is sufficient evidence in the record to support the departure. Appellant invaded the victim's zone of privacy by illegally entering the victim's trailer. The assault on the victim was particularly cruel. Appellant and his accomplice tied the victim to his bed so that he was completely helpless, threw a blanket over his head so that he was unable to see, and hit the victim multiple times on the back of the head with both a hammer and a BB gun. *See State v. Kisch*, 346 N.W.2d 130, 133 (Minn.1984) (multiple blows to skull supported finding of particular cruelty in a felony murder case).

In addition, appellant had known the victim for many years and must have known that the victim was mentally retarded and therefore vulnerable. Further, appellant and his accomplice attacked the victim when the victim was still in bed, lying face down with a blanket over his head and unable to see or protect himself. These facts distinguish this case from a "typical" felony murder. *See State v. Bock*, 490 N.W.2d 116, 121 (Minn.App.1992), *pet. for rev. denied* (Minn. Aug. 27, 1992).

Appellant argues that equitable principles require that his sentence be re-

duced so that it is similar to that of his accomplice, who was sentenced to 165 months. Although a reviewing court has the discretion to do so in appropriate cases, this is not such a case. *See State v. Vazquez*, 330 N.W.2d 110, 112 (Minn.1983) (appellate court has discretion to modify sentence in interests of fairness and uniformity).

The trial court was aware that the evidence indicated that appellant knew the victim, chose the victim, had threatened to kill the victim in the past, and that appellant had struck the fatal blows with the hammer. Appellant's involvement indicates principal responsibility for the crime. *See Vazquez*, 330 N.W.2d at 111–12 (citing *State v. Burgess*, 319 N.W.2d 418, 421 (Minn.1982)). The trial court did not err by sentencing appellant to a longer sentence than his accomplice received under a plea agreement.

## DECISION

Although the use of an unrecorded interview prior to going on record is not condoned, appellant's recorded statement was not improperly coerced, and thus was properly admitted at trial. Appellant's sentence, a double upward durational departure, was justified.

**Affirmed.**