STATE of Minnesota, Respondent,

v.

Paul Arthur WILSON, Appellant.

No. C6–94–1860.

Supreme Court of Minnesota.

July 21, 1995.

Edward L. Sisam, Sisam & Associates, P.A., Edina, and James S. Dahlquist, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Bev Benson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

KEITH, Chief Justice.

On December 19, 1993, appellant, Paul Arthur Wilson, shot and killed Maryann "Mary" Hagford in the Crystal, Minnesota house he

and Hagford owned. Within an hour of the shooting, Wilson was arrested in connection with Hagford's death. Subsequently, a jury convicted Wilson of premeditated first-degree murder and he was sentenced to life imprisonment. Wilson appeals from the judgment of conviction, and we affirm.

Wilson and Hagford met in 1986 as co-workers and began dating shortly thereafter. During the ensuing years, alcohol played a significant role in their relationship and both drank regularly. In 1988, they purchased a house together on Vera Cruz Avenue in Crystal, Minnesota and thereafter intermittently lived together in this home.

On the morning of December 19, 1993, Wilson awoke at approximately 6:00 a.m. and began drinking alcohol. At 11:00 a.m., Wilson called his mother and told her that he and Hagford were planning to buy a Christmas tree. During the ten minute conversation, Wilson's mother detected that he had been drinking and that his voice was not clear.

Just before noon, Wilson and Hagford drove to a nearby Christmas tree lot and purchased a tree. They chose this particular lot because they knew they could have a drink at the VFW next door before returning home. Wilson and Hagford entered the VFW at approximately noon and stayed for less than an hour and a half. During that time, Wilson drank two shots of tequila, and Hagford drank one beer. Although Wilson disputes that they had an argument, Hagford left the bar before Wilson.

By 2:00 p.m. that afternoon, Wilson had returned home and again called his parents. This time, he spoke with his father who was watching the half-time program of the Vikings football game. As was their practice, Wilson and his father discussed the game. Also, Wilson told his father that he and Hagford were having difficulty cutting off the end of the Christmas tree with what Wilson's father determined to be a finishing saw. During this five-minute conversation, Wilson's father detected that Wilson was "thick-tongued" and had been drinking.

At 2:30 or 2:40 p.m., Wilson called his parents a final time. When his mother answered the phone, Wilson said "Mama, mama, come quick! Mary's dead." Wilson's parents immediately drove to the Vera Cruz Avenue residence where they found Wilson standing near the garage. After speaking with Wilson for a few minutes, Wilson's father entered the home to call the police and found Hagford's body on the living-room floor. A few minutes later, Wilson's mother also entered the home, inadvertently kicking a handgun that was on the living-room floor. Worried that the gun would discharge, Wilson's mother placed the gun on the living-room couch.

At 2:47 p.m., Crystal police were dispatched to the home. The officers who initially entered the home found Hagford's body face-up in the living-room and determined she was dead. The officers noted the home was in a state of disarray, and they found numerous alcohol bottles present. A Christmas tree was lying on its side in the living-room area and had saw marks and blood on its base. The officers also found a bloodied saw and a shell casing on the floor near the tree, and they noted that a glass picture frame hanging near the living-room couch had been shattered, leaving broken shards of glass on the couch. Further, officers found the handgun Wilson's mother had placed on the couch and a significant amount of blood on the floor of the living-room. The largest pool of blood, roughly 18 inches in diameter, was under the base of the tree, 2 or 3 feet from the victim. A second, smaller pool of blood had collected under Hagford's body.

Based on an initial review of the crime scene, investigators determined that Hagford was likely shot in the back of the head at close range as she stood or kneeled over the end of the Christmas tree. Investigators also suspected that the body had been moved from its original position near the tree. An autopsy conducted the following day confirmed that Hagford died of a single gunshot wound to the back of the head, which was likely inflicted from behind when Hagford was in a kneeling position. Based on blood found inside the gun barrel and on an imprint of the muzzle on Hagford's head, the medical examiner also confirmed that the

gun found at the scene had been fired while pressed against the back of Hagford's head.

While other officers reviewed the crime scene, Sgt. Harty of the Crystal police approached Wilson and his parents. After determining that Wilson lived in the home, that Hagford was his girlfriend, and that Wilson and Hagford were the only persons home prior to the arrival of Wilson's parents, Sgt. Harty arrested Wilson and placed him in the back seat of a squad car. Five minutes later, Sgt. Harty got into the front seat of the car and asked Wilson several preliminary questions including his name, date of birth, and address. At 3:22 p.m., immediately following these questions, Sgt. Harty read Wilson his *Miranda* rights. According to Sgt. Harty, Wilson stated he understood his rights and agreed to answer questions. Sgt. Harty testified at the omnibus hearing regarding the exchange that followed:

A I asked, "Do you wish to talk to me at this time," and he agreed to talk to me about the incident.

Q Did you then ask him some questions?

A Yes, I did.

Q What did you ask him?

A I asked him what had happened that day, and he told me that he and the decedent, Mary Hagford, had been drinking all day. He stated that they had gotten angry at each other over smashing some Christmas ornaments. I asked him what happened to Mary, and he said he didn't want to talk about Mary just then.

I asked him if he owned a handgun, and he said yes, he did; he owned a Browning. I asked him what the caliber of the handgun was and he told me he didn't recall.

He told me that he called his parents and told them to come to the residence and had told them what had happened when he called them on the phone, and after this I quit questioning him.

According to Sgt. Harty, he interpreted Wilson's statement that he did not want to talk about Hagford just then to mean that Wilson was willing to talk about subjects other than Hagford. Sgt. Harty also indicated that although he could smell alcohol on Wilson's breath, Wilson appeared to be responsive to the questions and did not have difficulty with his balance or his speech. The entire conversation lasted 5 or 6 minutes.

At 3:37 p.m., Sgt. Harty transported Wilson to the Robbinsdale Police Department where they met Crystal police officer Lt. Gautsch. At 4:00 p.m., the two officers began to interview Wilson. Because Sgt. Harty indicated that he had earlier read Wilson his *Miranda* rights, Lt. Gautsch did not do so prior to this interview. Lt. Gautsch conducted the interview and wrote down both the questions and Wilson's responses.

During the interview, Wilson indicated he and Hagford had been drinking schnapps, beer and rum that day and had been arguing. Wilson recounted that he was sleeping on the living-room couch when Hagford came out of the bedroom screaming at him. Wilson stated that although Hagford did not have a weapon, she was threatening him and struck him on the feet. Wilson further stated that as Hagford approached, he reached for a gun he kept under the couch cushion and shot Hagford one time as she was standing near the bedroom door facing him. Although he kept an ammunition clip loaded in the gun, Wilson asserted he did not think a round was in the chamber. According to Wilson, after Hagford fell, he moved her to check on her condition.

Lt. Gautsch testified he did not initially tape-record this interview because he felt it would be intimidating. Near the end of the interview, Lt. Gautsch asked Wilson if he would be willing to have his statement taped, but Wilson responded "I wouldn't mind doing it, but not right now. You have to understand I just killed the woman I love."

At the end of the interview, Wilson sketched the crime scene and signed a form consenting to a search of his home. Lt. Gautsch testified that although Wilson had blood-shot eyes, smelled of alcohol, and stated he had been drinking since 6:00 a.m., Wilson did not appear to have difficulty with the tasks before him. Both Lt. Gautsch and Sgt. Harty also testified that Wilson was responsive, spoke clearly, and seemed to think about and understand the questions

before answering. Further, both officers testified that Wilson requested two bathroom breaks during the hour and a half interview, and Wilson did not appear to have difficulty with motor coordination as he walked. Following the interview, Wilson was taken to a hospital for a blood test, which indicated that at 6:10 p.m. he had a blood alcohol concentration ("BAC") of 0.29.

At approximately 6:40 p.m., after visiting the crime scene, Lt. Gautsch interviewed Wilson a second time, with Sgt. Harty again present. Prior to this second interview, Lt. Gautsch informed Wilson of his *Miranda* rights, and Wilson again stated he understood his rights. Lt. Gautsch used the same method of taking notes as he had in the first interview. The second interview lasted approximately 30–40 minutes and consisted of Lt. Gautsch questioning Wilson about several inconsistencies between Wilson's earlier statements and the evidence found at the crime scene.

Both officers testified that Wilson's demeanor in the second interview was similar to that in the first and that Wilson appeared competent to engage in clear, normal conversation. Lt. Gautsch also testified that although he would have liked to tape-record the second interview, he did not do so because he assumed Wilson would refuse as he had done in the earlier interview. In the evening following the interviews, Lt. Gautsch had his notes of the interviews typed, confirmed the accuracy of the typed report, and then threw away the notes.

At trial, the state's theory was that Wilson murdered Hagford during an argument between the two regarding the Christmas tree. According to the state's experts, the evidence at the crime scene suggested that Hagford was kneeling at the base of the Christmas tree with the saw in her hand, trying to cut the end off. At that point, according to the state, Wilson came from behind her, placed the muzzle of the handgun to the back of her head, and shot her, causing instantaneous death. In support of its theory, the state called witnesses who testified that the position of the body and the pattern of blood spatter marks on Hagford's body suggested she was kneeling with her head bent slightly forward and to the left, and when shot, she fell forward with her head down. One expert indicated that had Hagford been standing as Wilson indicated in his interview with police, blood from the gunshot wound would have created a "blood splatter" pattern on the wall. Such a pattern was not present at the scene. Further, the state's expert testified that the bullet's placement was consistent with the state's theory that Hagford was shot from behind while kneeling. The state also presented expert testimony indicating that after a significant amount of blood had drained out of the body, it was turned over and pulled backwards by the arms, away from the tree. The state emphasized the fact that the large pool of blood under the base of the Christmas tree was of such great volume that it had saturated the carpet and flooring and had dripped through to the basement. The state also emphasized, however, that when police arrived at the crime scene, Hagford's body was several feet away from this pool of blood and had a much smaller amount of blood pooled under it.

Moreover, in support of the premeditated murder charge, the state called a pathologist who testified that a person with a BAC of 0.34, which was Wilson's estimated BAC at the time of the shooting, could carry out volitional acts and could plan conduct. The expert further testified that the occurrence of a blackout or a memory failure due to intoxication was not relevant to the issue of whether the intoxicated person could formulate intent.

Although Wilson conceded at trial that he probably shot Hagford, he testified he did not intend either to harm or to kill her. Wilson testified he had been drinking heavily and had no memory of any events from Friday evening to Sunday morning of that weekend, and he did not recall any events from the time he left the VFW at 1:30 p.m. on Sunday until he heard an explosion and saw Hagford on the floor of their home. Wilson testified he remembered kneeling next to Hagford, seeing blood on her face, and later standing in the garage of his home, but he did not remember calling his parents or speaking with police at the scene. Further, although Wilson recalled being questioned at

the police department, he testified he did not recall the content of those discussions and did not remember speaking to Sgt. Harty or Lt. Gautsch.

On January 11, 1994, a Hennepin County Grand Jury indicted Wilson on three counts: premeditated first-degree murder, first-degree murder while committing domestic abuse, and first-degree assault. Trial began on June 20, 1994, and the jury returned verdicts 17 days later, finding Wilson guilty of premeditated first-degree murder and not guilty of first-degree murder while committing domestic abuse. On July 25, 1994, the trial court sentenced Wilson to life imprisonment for his conviction of first-degree murder.

Wilson appeals from the judgment of conviction, arguing he is entitled to a new trial on three grounds: 1) the trial court erred in admitting Wilson's post-arrest statements because they were obtained in violation of Wilson's right against self-incrimination, in violation of the tape-recording requirements of *State v. Scales*, and in violation of Wilson's due process rights; 2) the trial court erred in denying Wilson's motion for a new trial because the evidence presented at trial was insufficient as a matter of law to establish that Wilson possessed the requisite intent for premeditated murder; and 3) the trial court erred in denying Wilson's motion for a *Schwartz* hearing to assess allegations of juror misconduct.[1]

## I.

The first issue raised in this appeal is whether the trial court erred in admitting Wilson's post-arrest statements. Wilson asserts several grounds of error.

### A. *Right against self-incrimination*

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment applies to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). The Minnesota Constitution has an identical provision. Minn. Const. art. I, § 7.

 In light of these constitutional provisions, when law enforcement officers have taken an accused into custody, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). The officers may, however, approach an accused who has initially refused to talk and ask him to reconsider. *State v. Thieman*, 439 N.W.2d 1, 5 (Minn.1989). Whether statements obtained after an accused has decided to remain silent are admissible depends on whether the accused's right to cut off questioning has been "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975); *State v. Peirce*, 364 N.W.2d 801, 805–06 (Minn.1985).

In the present case, Wilson contends his expression to Sgt. Harty in the squad car that "he didn't want to talk about Mary just then" was an unequivocal invocation of his right to remain silent. Wilson argues, therefore, that Sgt. Harty should have complied with the requirements of *Thieman* and *Mosley* before reapproaching him. Instead, Wilson contends, Sgt. Harty immediately asked him additional questions, thereby failing to scrupulously honor his right to remain silent.

This court has before considered whether an accused's expression that he does not wish to talk about a particular subject constitutes an invocation of the right to remain silent. In *State v. Jobe*, we held that the defendant failed to invoke his right to remain silent by stating that he did not want to discuss what he had done on the previous evening but that he was willing to talk about "lighter" subjects. 486 N.W.2d 407, 415 (Minn.1992). Noting that we have never explicitly addressed the effect of an equivocal request to remain silent, we found some guidance in other cases holding that the defendant failed

---

1. Although Wilson raised a fourth issue,—that the trial court erred in denying his motion to dismiss because the domestic homicide statute is unconstitutionally vague—Wilson was not convicted under that statute and we find no reason to address the matter.

to invoke the right to remain silent despite having made an at least ambiguous attempt to invoke the right. *Id.* at 415–16 (citing *United States v. Joyner,* 539 F.2d 1162 (8th Cir.1976), *cert. denied,* 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed.2d 593; *State v. Nelson,* 257 N.W.2d 356 (Minn.1977); *People v. Rickard,* 99 Ill.App.3d 914, 55 Ill.Dec. 144, 425 N.E.2d 1317 (1981)). We thus concluded in *Jobe* that the defendant's response was not an unequivocal assertion of his right to remain silent and that the trial court did not err in admitting the statements that followed. *Jobe,* 486 N.W.2d at 415.

More recently, in *State v. Williams,* this court addressed the issue of the invocation of the right to remain silent. 535 N.W.2d 277 (Minn.1995). In *Williams,* we considered whether the defendant's conduct of rising from his chair, turning toward the interrogating officer, stating "I don't have to take any more of your bullshit," and walking out of the room constituted the defendant's invocation of his right to remain silent. We concluded that the defendant's conduct did not invoke his right to remain silent, and we stated that "nothing short of an unambiguous or unequivocal invocation of the right to remain silent will be sufficient to implicate *Miranda*'s protections."

■ In the present case, the trial court concluded that Wilson's expression that he did not wish to talk about Mary was not sufficient to invoke Wilson's right to remain silent as to other subjects of discussion. Further, the trial court noted that to the extent the statement did invoke Wilson's right to remain silent on the subject of Hagford, the police honored this request by ceasing to ask questions about her specifically. This conclusion is consistent with our holdings in both *Jobe* and *Williams.* Here, as in *Jobe,* the defendant expressed he did not want to talk about a particular subject, but appeared willing to, and in fact proceeded to, answer questions relating to other subjects. Also, similar to our holding in *Williams,* Wilson's statement was, at best, an equivocal response and therefore was not sufficient to invoke the right to remain silent.[2]

■ Although we have concluded that Wilson did not invoke his right to remain silent, we have yet to address whether Wilson effectively waived his right against self-incrimination. Under the constitutional protections afforded by the Fifth Amendment, the state cannot use an accused's admission unless it can show that the accused intelligently waived the right against self-incrimination and that the statement was freely and voluntarily made. *Miranda,* 384 U.S. at 444–45, 86 S.Ct. at 1612; *see Haynes v. Washington,* 373 U.S. 503, 512–13, 83 S.Ct. 1336, 1342, 10 L.Ed.2d 513 (1963). It is the trial court's responsibility to make a subjective factual inquiry to determine whether, under the totality of the circumstances, the waiver was knowing, intelligent, and voluntary. *State v. Linder,* 268 N.W.2d 734, 735 (Minn.1978). In conducting this inquiry, the court will consider factors such as "age, maturity, intelligence, education, experience, ability to comprehend, lack of or adequacy of warnings, length and legality of detention, nature of interrogation, physical deprivations, limits on access to counsel and friends, and others." *Id.*

■ On appeal, this court accepts the trial court's findings of fact surrounding the accused's statement unless those findings are clearly erroneous, *State v. Johnson,* 463 N.W.2d 527, 533 (Minn.1990), but the court will make an independent determination, on the basis of the facts as found, of whether the state has shown by a fair preponderance of the evidence that the waiver was knowing, intelligent, and voluntary. *Linder,* 268 N.W.2d at 735.

In this case, the trial court concluded that although Wilson had a 0.29 blood alcohol concentration when tested and was intoxicated during the interview process, he was able to comprehend his situation. Specifically, the trial court emphasized that Wilson was able to speak with his father about cutting the tree with the wrong type of saw, was able to draw a diagram of the house for Lt. Gautsch, and was able to converse coherently with police. The trial court concluded Wil-

---

**2.** Because we conclude Wilson did not invoke his right to remain silent, we need not address whether the police scrupulously honored this right.

son was not intoxicated to the point that it interfered with an intelligent, knowing waiver of his Fifth Amendment rights, and therefore it admitted Wilson's post-arrest statements.

We conclude that the trial court's factual findings are not clearly erroneous. The record shows that Wilson was 26 years old; had been working full-time and owned his own home for several years; appears on the record to have normal intelligence and literacy; apparently graduated from high school; had previous experience with being arrested; was questioned for five minutes in the squad car and for roughly an hour and a half in the interview room; was permitted two bathroom breaks, which he requested; had no difficulty with motor coordination in walking or in completing other tasks during the interviews; and, according to both officers, was clear and responsive without any indication of difficulty or an inability to comprehend the questions asked of him or the situation with which he was presented. Moreover, when questioned by the prosecution, Wilson's expert witness, who testified on the effects of alcohol on the human brain, acknowledged that an individual's speech, motor coordination, ability to respond and cognitive ability are all indicative of the individual's degree of impairment. We therefore conclude that the state has shown by a fair preponderance of the evidence that the waiver was knowing, intelligent, and voluntary.

## B. Tape-recording requirement

Wilson next contends that the trial court should have suppressed his post-arrest statements because the officers failed to tape-record his interrogation as required by *State v. Scales*, 518 N.W.2d 587 (Minn.1994). In *Scales*, this court held that

all custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention. If law enforcement officers fail to comply with this recording requirement, any statements the suspect makes in response to the interrogation may be suppressed at trial.

*Id.* at 592. The opinion explicitly applies prospectively from the date of the filing of the opinion on June 30, 1994. *Id.* at 593.

Recently, this court reaffirmed the prospective nature of the ruling in *Scales*. In *State v. Thaggard*, we noted that "[o]ur decision in *Scales* * * * was prospective in nature, applying to interrogations occurring from the date of filing of our opinion, June 30, 1994." 527 N.W.2d 804, 808 (Minn.1995), *as amended* (Minn., Jan. 19, 1995). Clearly, the reporting requirement of *Scales* is not applicable to the present case because Wilson's interrogations occurred on December 19, 1993—more than 6 months before the *Scales* opinion was filed.

Further, although prior to *Scales* we clearly encouraged law enforcement officers to record all interrogation with an accused, tape-recording was not a strict requirement at the time Wilson was interrogated. *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991); *State v. Erickson*, 449 N.W.2d 707, 711 n. 4 (Minn.1989); *State v. Robinson*, 427 N.W.2d 217, 224 n. 5 (Minn.1988). Thus, Lt. Gautsch's failure to record the conversations with Wilson did not itself invoke the remedy of suppression, and the trial court was free to consider the failure to tape record as one factor in the totality of the circumstances. *See Thaggard*, 527 N.W.2d at 808. In doing so, the trial court was not obligated to discredit the officers' testimony in determining the veracity or completeness of the transcribed statement or the voluntariness of Wilson's statements. We detect no error in the trial court's refusal to suppress Wilson's post-arrest statements on the asserted basis of a failure to tape-record the statements.

## C. Due process

Wilson further argues that Lt. Gautsch's failure to preserve his original interview notes violates Wilson's due process rights. Wilson contends that no reliable or complete record of the interrogations exist because the original interview notes were destroyed and because Wilson himself cannot recall these conversations.

In making this argument, Wilson cites no authority for the contention that the officers

were required to retain any original handwritten notes taken during the interviews. Instead, Wilson cites two factors he asserts are indicative of the "tainted and unreliable" nature of the statements as presented to the jury: that Lt. Gautsch admitted he did not write down all of the questions and answers, and that the two officers differed in their descriptions of Wilson's demeanor.[3]

In regard to Wilson's first contention, it is not clear from the record that Lt. Gautsch admitted he did not write down all of the questions and answers. The exchange between Lt. Gautsch and counsel at trial was as follows:

Q And how did you go about conducting this interview?

A Well, I asked questions. I wrote the questions on a tablet. I had several tablets with me. And then I wrote his responses on that same tablet as close to verbatim as I could.

Q Did you write the question down before you actually asked it?

A Yes. Usually, most of the questions I did, yes.

Q And then Mr. Wilson would respond and you would write the response down?

A Yes, I did, and, in fact, that was kind of a tedious process because my writing skills aren't that of a stenographer, and it was kind of slow in the process, but I was trying to be careful to make the best record of the conversation that I could.

Based on this exchange, it is reasonable to interpret Lt. Gautsch's statement "usually, most of the questions I did" as a response to the question of whether he wrote down the question *before* he asked it, as opposed to responding to an inquiry of whether he wrote down the question at all. This interpretation of Lt. Gautsch's answer is most consistent with his later testimony that he attempted to write down the interview verbatim. Further, Lt. Gautsch testified he stayed late that night to have his notes typed, and he checked the typed statement for accuracy before disposing of the notes.

In regard to Wilson's second argument that the two officers' accounts of the interviews conflicted, we do not find it extraordinary that two people observing the same conduct have reached differing conclusions as to the perceived emotional demeanor of the subject. Moreover, the record suggests no other conflicts in the officers' testimony as to what they perceived at the interviews.

Thus, we conclude Wilson's arguments in this regard are without merit.

## II.

The second issue raised in this appeal is whether the trial court erred in denying Wilson's motion for a new trial on the ground that the evidence presented at trial was insufficient as a matter of law to establish that Wilson possessed the requisite intent for premeditated murder.

■ In reviewing a sufficiency of the evidence claim, this court is limited to ascertaining whether, given the facts in the record and any legitimate inferences that can be drawn from those facts, a jury could reasonably find that the defendant was guilty of the charged offense. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). This court will not retry the facts, but instead views the evidence in a light most favorable to the jury's verdict and assumes that the jury believed the state's witnesses and disbelieved any evidence to the contrary. *Id.; State v. Merrill*, 428 N.W.2d 361, 366 (Minn.1988). If the jury, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably have found the defendant guilty, the verdict will stand. *State v. Norgaard*, 272 Minn. 48, 52, 136 N.W.2d 628, 631–32 (1965).

In this appeal, Wilson challenges his conviction for first-degree premeditated murder. Minnesota Statutes section 609.185 provides:

 Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

---

**3.** In support of his contention that the officers' accounts of the interview differed, Wilson notes that Sgt. Harty described Wilson's emotional demeanor as "upset and angry," whereas Lt. Gautsch described Wilson's emotional demeanor as "somber."

(1) causes the death of a human being with premeditation and with intent to effect the death of the person or of another; (1992). The court instructed the jury that " '[p]remeditation' means that defendant considered, planned, prepared for, or determined to commit the act before defendant committed it. Premeditation, being a process of the mind, is wholly subjective and hence not always susceptible to proof by direct evidence. It may be inferred from all the circumstances surrounding the event."

Wilson essentially argues that the evidence presented at trial was insufficient to establish the required element of premeditation because his state of intoxication precluded him from forming the requisite intent of premeditation. This argument is primarily based on trial testimony that Wilson had an estimated BAC of .34 to .36 at the time he shot Hagford and that such a BAC level typically would render an individual "profoundly handicapped."

■ Although it is true that testimony at trial indicated Wilson was intoxicated for much of the day on which he shot Hagford, it is equally true that the state presented evidence countering Wilson's contention that he was so intoxicated he could not form the intent necessary for premeditated murder. For example, both Sgt. Harty and Lt. Gautsch testified that during the four hours they spent with Wilson, he spoke clearly, responded to questions in a coherent fashion, walked without coordination problems, and otherwise appeared to comprehend his surroundings and situation. Further, the state called as a witness the chief medical examiner for Hennepin County, who testified that alcohol impairment varies from person to person, and that a person with a BAC of 0.34 can carry out purposeful, volitional conduct and is capable of planning. The expert testified that even if Wilson were in a blackout state as he suggests, such a state affects only his ability to recall the events during that time and does not relate to his ability to formulate intent.

At trial, the jury became aware of Wilson's estimated BAC at the time of the shooting and heard testimony regarding Wilson's degree of impairment. Clearly, it is within the jury's province to weigh the evidence and to make credibility determinations regarding which evidence to assign significance. In this case, the jury reasonably could have found Wilson guilty by accepting the testimony of the state's expert witness regarding the ability of an intoxicated person to premeditate and by believing the officers' assessment of Wilson's state of impairment and the substantial forensic and physical evidence suggesting a premeditated shooting. We conclude, therefore, that the state's evidence was sufficient as a matter of law to establish that Wilson possessed the requisite intent for premeditated murder.

### III.

Wilson's final argument is that the trial court erred in refusing to conduct a *Schwartz* hearing to assess the alleged misconduct of Juror B.D.

■ In *Schwartz v. Minneapolis Suburban Bus Co.*, this court established a method for inquiring into allegations of juror misconduct. 258 Minn. 325, 328, 104 N.W.2d 301, 303 (1960). At a minimum, the defendant must establish a prima facie case of jury misconduct before a *Schwartz* hearing is mandated. *State v. Larson*, 281 N.W.2d 481, 484 (Minn.1979), *cert. denied*, 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388. To establish a prima facie case, "a defendant must submit sufficient evidence which, standing alone and unchallenged, would warrant the conclusion of jury misconduct." *Id.* The decision whether to grant a *Schwartz* hearing is generally left to the discretion of the trial court. *Zimmerman v. Witte Transp. Co.*, 259 N.W.2d 260, 262 (Minn.1977).

■ Wilson contends that jury foreman B.D. failed to answer the Jury Questionnaire Form truthfully by withholding information regarding his religious background. According to Wilson, another juror approached Wilson's attorney following the return of the jury verdict and expressed concern that Juror B.D. was an ordained Baptist minister and may have held traditional Baptist religious views impacting his ability to remain unbiased. In arguing the matter to the trial court, Wilson rested his allegation of juror

misconduct solely on his own trial counsel's assertion that Juror B.D.'s status as a Baptist minister directly affected his ability to remain unbiased.[4] Faced with these allegations, the trial court denied Wilson's motion for a new trial and did not order a *Schwartz* hearing on the matter. The trial court concluded that even assuming Juror B.D. was an ordained Baptist minister and assuming traditional Baptist views are opposed to drinking, the court was not convinced either that Juror B.D. lied or that these factors affected the verdict.

In *State v. Benedict*, this court addressed an allegation of jury misconduct similar to that made in the present case. 397 N.W.2d 337 (Minn.1986). In *Benedict*, the issue came to light in the context of a sexual assault case when a juror alleged that the jury foreman revealed during deliberations that he had been abused by his brother as a child. *Id.* at 338. In addressing the issue, the court noted that numerous decisions have held that the trial court exercises fairly broad discretion in determining whether to grant a hearing. *Id.* at 339. According to the trial court's recollection of voir dire, of which no record existed, defense counsel asked the jurors whether they had any prior experience with a "sexual case" and added, without pausing, "any family members, any close friends?" *Id.* To this, the juror in question responded in the negative. Based on this voir dire exchange, we concluded that defense counsel "did not ask the sort of clear question that, absent a lack of credibility on the juror's part, necessarily would have elicited the disclosure of the sort of information that the foreman withheld." *Id.* at 340. Thus, we held that the defendant failed to make a sufficient showing that the juror had lied. *Id.*

The record in the present case suggests the trial court did not err in its determination. First, similar to the facts of the *Benedict* case, it is not clear that Juror B.D. withheld any information in response to a specific question. In several places on the application and during voir dire, Juror B.D. made references to his affiliation with the Baptist church. In response to a question asking what type of organizations, clubs or social activities in which the juror participates, Juror B.D. wrote in the blank following the word "Religious:" "CHURCH, MINNETONKA BAPTIST." When questioned on voir dire about how his wife "keeps busy," Juror B.D. responded "[s]he is involved in a lot of church activities, community affairs, clubs." Although Wilson suggests Juror B.D. should have expressed his religious affiliation or interests at every possible opportunity, the juror was never posed with the "sort of clear question that * * * necessarily would have elicited the disclosure of the sort of information that the foreman withheld." *See Benedict,* 397 N.W.2d at 340. The fact he did not do so does not render his responses untruthful.

Second, it is not clear Juror B.D.'s ability to remain unbiased was affected by his religious affiliation. The trial court noted "this was, by far, the most thorough voir dire I have ever seen in any case," and counsel spent considerable time inquiring into possible biases of Juror B.D. In response to these questions, Juror B.D. indicated he has no moral or religious views opposing alcohol and indicated "I enjoy good wine with a good meal." And, when questioned about his feelings toward people who are alcoholic, Juror B.D. related that his own son had several years' experience with 'marijuana and leisure drugs [and it] took him a while to work through that."

On the above facts, we conclude that the trial court did not err in refusing to conduct a *Schwartz* hearing.

Affirmed.

---

4. Although Wilson also cites to an affidavit of Douglas G. Frey, Ph.D, to support his juror bias theory, this affidavit was notarized on December 19, 1994—nearly five months after the trial court denied Wilson's motions for a new trial—and was not presented to the trial court prior to its decision regarding potential juror misconduct. Thus, the record shows that the trial court was presented only with trial counsel's assertions that an ordained Baptist minister typically would have a bias against persons with an alcohol or drug addiction.